IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

```
United States of America      )
                              )
                              )
      -vs.-                    )    3:12-cr-00430
                              )    May 29, 2013
Lisa Ellen Bifield,           )    Columbia, SC
Daniel Eugene Bifield,        )
                              )
        Defendants.           )
_____)
```

BEFORE THE HONORABLE CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE, PRESIDING
SENTENCINGS

A P P E A R A N C E S:

For the Government:        JULIUS NESS RICHARDSON, AUSA
                           JAMES HUNTER MAY, AUSA
                           United States Attorney's Office
                           1441 Main Street, Suite 500
                           Columbia, SC 29201

For Lisa Bifield:          LOUIS H. LANG, ESQ.
                           Callison, Tighe & Robinson
                           P.O. Box 1390
                           Columbia, SC 29202-1390

For Daniel Bifield:        ALLEN B. BURNSIDE, APD
                           KATHERINE E. EVATT, APD
                           Federal Public Defender's Office
                           1901 Assembly Street
                           Columbia, SC 29201

Court Reporter:            Jennifer H. Williams, RPR
                           United States Court Reporter
                           901 Richland Street
                           Columbia, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

2

THE COURT: All right, Mr. Richardson.

MR. RICHARDSON: Thank you, Your Honor. Do you have a preference on order this afternoon?

THE COURT: Let's call Ms. Bifield first.

MR. RICHARDSON: Thank you, Your Honor. United States vs. Lisa Ellen Bifield, criminal number 3:12-430. We're here for Ms. Bifield's sentencing. The Government has reviewed the pre-sentence report and has no objection to it. At an appropriate time the Government would make a motion for an upward variance to 84 months as set forth in the plea agreement based on the facts in the PSR as well as the information in the record.

THE COURT: All right. Thank you.

All right. Mr. Lang, how are you?

MR. LANG: Just fine. Thank you, Your Honor.

THE COURT: Good. All right. Mr. Lang, I have a couple of documents I wanted to mention so that you know what I have and I'm sure that I have everything that you want me to have. Of course I have a pre-sentence report. I have a sentencing memorandum that you filed. I have a letter from Lynn Shipes, S-H-I-P-E-S. I have a letter from Ms. Bifield. And I have a letter from Lynn Madden, M-A-D-D-E-N, who is Ms. Bifield's sister. And those are the various documents that I have. Is there anything else that you wanted me to have?

MR. LANG: There is nothing else, Your Honor.

THE COURT: Okay. All right. Now, have you and Ms. Bifield had an opportunity to read, review, and discuss her pre-sentence report and the addendum to it?

MR. LANG: We have, Your Honor. Did you mention a letter from Dayton Riddle, an assistant solicitor, at the --

THE COURT: I saw that. It must be attached.

MR. LANG: It's attached to the sentencing memorandum.

THE COURT: It is. It's attached to your sentencing memorandum.

COURT REPORTER: If you could cut the mike on, please. Thank you.

THE COURT: Okay.

MR. RICHARDSON: Your Honor, if I might. It probably doesn't matter, Your Honor. But the first letters you mentioned I'm not sure that I've seen. It probably makes no difference that I've not seen them. I suspect I -- but I don't know whether I received a copy of those.

THE COURT: Okay. I know that the one from Ms. Bifield and the one from her sister were filed.

MR. RICHARDSON: Okay.

THE COURT: And then the other one --

MR. RICHARDSON: The one I didn't recognize was Snipes.

THE COURT: -- just came in more recently. And Ms.

Shipes --

MR. RICHARDSON: Shipes.

THE COURT: -- has not been filed. I think it just came in this week.

MR. RICHARDSON: That's fine, Your Honor.

THE COURT: Okay. I'll be glad to let you look at it if you'd like to.

MR. RICHARDSON: I don't need to. Thank you, Your Honor.

THE COURT: All right. And then attached to your sentencing memorandum is the letter from Assistant -- Deputy Solicitor Dayton Riddle dated May 28th.

MR. LANG: Yes, ma'am. I just wanted to make sure it got to Your Honor. I know I filed it.

THE COURT: Okay. I have that. All right. And I assume you've seen that, Mr. Richardson?

MR. RICHARDSON: I have, Your Honor. And I've spoken repeatedly with Mr. Riddle on a variety of different matters.

THE COURT: Okay. All right. Now, let's go to the report first. Have you and Ms. Bifield had an opportunity to read, review, and discuss the pre-sentence report and the addendum to the report?

MR. LANG: We have, Your Honor.

THE COURT: All right. Ms. Bifield, did you read

this report?

DEFENDANT:  Yes, ma'am.

THE COURT:  Did you have a chance to discuss it fully with your attorney?

DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  Now, Mr. -- and you may have a seat, Ms. Bifield.  Mr. Lang, there were no formal objections to the report which would affect the calculation of the advisory sentencing guidelines.  You did offer a number of comments regarding disagreements that your client has with information contained in the report.  Some of the items were revised as I understand it.  Some parts of the report were revised to address some of those issues.  And then for the ones that were not revised to her satisfaction, you have pointed out her position here, and it's set forth in the addendum on pages 1 through 3.

MR. LANG:  That is correct, Your Honor.

THE COURT:  Okay.  All right.  So as I understand it, you're not seeking a ruling on each of these items.  It's just basically her side of the story in those cases where she disagrees with what the report says?

MR. LANG:  That is correct, Your Honor.  And there is some additional information as to a medical condition which is set out in the addendum.

THE COURT:  I saw that.  Okay.  All right.  Now,

with that understanding, Ms. Bifield, then that these are not formal objections on which are you seeking a ruling but they are you setting forth your position on things that you disagree with in the report but they don't affect the guidelines, is that agreeable to you?

DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  All right.  Then the Court will note that there are no objections to the report and will adopt the factual statements in the report as its findings of fact.

We start with a situation where we don't really have an applicable offense level or criminal history category because we have a statutory sentence here of five years to life. There is a guideline range of 60 months imprisonment that applies to that particular offense of conviction with a supervised release range of two to five years and a special assessment fee of $100.  So do you agree that that guideline has been correctly calculated?

MR. LANG:  I do, Your Honor.

THE COURT:  All right.  And the Government agrees?

MR. RICHARDSON:  We do, Your Honor.

THE COURT:  Okay.  All right.  Let me hear from the Government now on their motion for upward variance.

MR. RICHARDSON:  Your Honor, I'm happy to answer any questions that you might have.  Your Honor is quite

familiar with the case and the circumstances that have led us here; in particular, reviewing the pre-sentence report and the detail that's included there as well along with Ms. Bifield's actions as well as her various attempts to cooperate, some of which successfully like as in Mr. Riddle's case where she did testify for the State in a trial, and then some not so successfully with respect to her cooperation with the Government.

As a result of all of that information, the conduct that she engaged in, as criminal activity and the conduct, both good and bad, that she has engaged in since being arrested, the Government, I understand with the agreement of the defense counsel and the defendant as set forward in his sentencing memorandum, the Government would make a motion for an upward variance to 84 months which is approximately -- I don't know exactly -- two years greater than the mandatory minimum set forth by the statute. We think that's an appropriate sentence. Because there's not really a guideline level, it's hard to say exactly, but it's about a two-and-a-half or three-level upward variance, is what we'd be asking for.

THE COURT: All right. Okay. Mr. Lang, I'll be glad to hear anything you or Ms. Bifield or anyone else would like to say about her.

MR. LANG: May it please the Court, Your Honor.

Louis Lang for Ms. Bifield.  Judge, the purpose of my sentencing memorandum, as I think I set out as clearly as I could, was to urge the Court to accept the Government's motion for an upward variance of two years with our concurrence.

Two years is a long time, but we felt upon my advice that given Ms. Bifield's potential exposure, considering the disagreement with the Government as to her alleged breach of her plea agreement, that that was an adequate compromise given that potential exposure.  And so we accepted that, Your Honor.

And certainly I don't want to regurgitate my sentencing memorandum, but given the general around-the-country federal sentencings for firearm offenses, 84 months seems to be in line.  Ms. Bifield of course being a woman, being somewhat older than the usual federal defendant, having maintained steady employment throughout most of her adult life with the exception of the period of time she was a stay-at-home mother, as well as her support that she has in this community upon her return to the community, I would suggest to the Court that a period of confinement of 84 months is an adequate sentence, given the totality of the circumstances in this particular case.

And so I would urge the Court to accept the Government's recommendation of 84 months.  We certainly don't have any

disagreement with that at this point and ask that the Court sentence Ms. Bifield to 84 months.

I would invite the Court's attention to a number of her family members who are in the courtroom today. Her mother and father are here, Dotty Madden and Bill Madden. Mr. Madden, her father, would like to say a few words on her behalf.

Furman Myers, her former husband, is here as well, and he would like to say a few words on her behalf. Danica, her 14-year-old daughter, is here and will accompany Mr. Madden to the podium -- Mr. Myers rather to the podium -- but I don't think she will speak on her mother's behalf.

Lynn Madden is here as well, Ms. Bifield's sister. Lynn's son is here. And I think I've covered just about everybody with the exception of Brittany Burns, Ms. Madden's {verbatim} other daughter, is here as well.

So if Your Honor please, if they could say a couple of words on her behalf, we would appreciate it. Then Ms. Myers has asked -- Ms. Bifield has asked that I read a short statement to the Court for her allocution rights. She is really too emotional to speak directly to the Court.

THE COURT: All right. Let's hear from Mr. Madden first then.

MR. LANG: Mr. Madden, if you'll step right up.

THE COURT: We have a microphone right here at the

podium, and you should step up to that, please, sir.  Yes, sir.  Would you tell us your full name, please?

MR. MADDEN:  My name is William C. Madden.

THE COURT:  M-A, double D, E-N?

MR. MADDEN:  Yes, ma'am.

THE COURT:  Okay.  Yes, sir.

MR. MADDEN:  And I am Lisa's father.  And I do not have a whole lot to say because I won't take up your time.  But Lisa is a good person.  In your decision I hope you will consider that her daughter who is 15 years old is going to need her, and also consider our, mine and my wife's, stage in life, that, you know, we'll hopefully be around when she gets out.

THE COURT:  Thank you for coming for her.

MR. MADDEN:  Thank you.

THE COURT:  All right.  Mr. Myers.  Yes, sir.  Your name?

MR. MYERS:  Furman Lewis Myers.

THE COURT:  All right.

MR. MYERS:  And I am Lisa's ex-husband.  But I have known Lisa for 21 years.  We were married for 14 of those years.  This is our daughter who is 14.  And I'd just like to let you know that --

THE COURT:  Kleenex is right there if you want one, right in front of -- right here.

MR. MYERS: -- although she has made some mistakes, you know, that she is a very loving mother and she's still a great friend to me. You know, she's always been a very hard worker, you know, loves her family. And I've been, you know, taking Danica to see her for the last year in Lexington County.

But I have seen a big change in her. You know, her whole outlook on life has changed. Her priorities have changed. And I know that, you know, the past year has been a humbling experience for her.

And we do ask, you know, that if there is anything, any classes or anything that she can take, you know, I'd love to see her time be as short as possible, because, you know, Danica does need her mother. It's tough on me because I'm a single father.

But, you know, she -- I just hope that, you know, that -- I want you to know that when she does get out, you know, that we will be there for her, you know, to support her and guide her and help her, you know, to regain herself in society in a positive way.

THE COURT: All right. Thank you.

MR. MYERS: Thanks.

THE COURT: All right, Mr. Lang.

MR. LANG: Your Honor, if I could read this letter to the Court --

THE COURT:  Sure.

MR. LANG:  -- for Ms. Myers {verbatim}.  Ms. Bifield.  I'm sorry.

THE COURT:  Could you pull that mike a little closer?  Thank you.

MR. LANG:  "I would first like to apologize to my family, the Court, and the federal government for allowing myself to become involved in something such as this.  I am truly sorry.  I must admit that I am ashamed and embarrassed by all of this.  Anyone who truly knows me knows all of this is out of my character.  There is no excuse for my actions, so I will not try to explain, nor will I lie in order to sugarcoat things.

My involvement in this nightmare has really hurt the people I love so dearly, especially my 14-year-old daughter, Danica.  The pain I have caused her is unbearable.  The pain of me not being with her is far worse than any pain I will feel from a prison.

I have, and I will, be missing the most important years of her life, her teenage years.  I can only pray that out of all of this Danica will learn from my mistakes and that also if any of her friends or anyone she may know gets in with the wrong crowd, Danica can share my mistakes and her pain with them in hopes of helping someone from going down the wrong road in life.  That is the only good that could come out of

all of this.

My daughter, Danica, said it best when she wrote on her Facebook, 'My mom, a beautiful and good woman, she made a mistake. Everyone makes mistakes. Some just don't get caught. If you never get caught, chances you are will never learn. I believe my mom has learned.'

I must say that Danica is right. I made a mistake, got caught, and I have indeed learned from all of this the hard way. If given the chance, I would like to work with schools and churches in regard to gangs, drugs, and illegal activities. I feel that I can honestly make a difference in at least one person's life. Once again, I am truly sorry.

Respectfully, Lisa Bifield."

THE COURT: All right. Ms. Bifield, you are entitled to speak in addition to that if you wish to do so, and you're not required to do so. I just want to give you that opportunity.

DEFENDANT: Okay. Thank you.

THE COURT: Okay. All right. Anything else from you, Mr. Lang?

MR. LANG: Nothing further, Your Honor.

THE COURT: Anything else from the Government?

MR. RICHARDSON: Nothing at all, Your Honor.

THE COURT: All right. The Court is going to grant the Government's motion for upward variance as agreed to by

the defendant, is going to vary upward to a guideline range of 84 months.  The Court finds that the 84-month agreed-on range is sufficient but not greater than necessary to achieve the purposes of sentencing.

I have considered and I've calculated the advisory sentencing guidelines and I've also considered the relevant statutory sentencing factors.  I would have to say that in terms of the nature and circumstances of the offense that Mrs. Bifield's conduct was not a one-time thing.  There was significant activity of a criminal nature over a significant period of time, the time period involved in the actual investigation of this conspiracy; and that, therefore, a lower sentence would not be appropriate in this case.

So I have also considered the characteristics of Ms. Bifield, her prior history.  She does have a relatively minor prior criminal history.  She has some problems in terms of needing some mental health treatment and assistance in that regard.  I believe she needs a GED and maybe some drug treatment.  It seems to me that you need some tools that will enable you to be able to comply with your supervised release once you are released from prison.  So I've considered that.

I've also considered the need to avoid unwarranted sentencing disparities as to similarly situated co-defendants, and I have looked at other defendants who have already been sentenced and their roles in the case compared

to your role in the case as well as those who have yet to be sentenced and have determined that it would not create an unwarranted sentencing disparity to sentence you to a term of 84 months.

I have also considered the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide adequate punishment, to deter others who might consider committing similar crimes, and to protect the public from further crimes. I have also considered your need for further educational training and medical care.

So after considering all of those, it is the judgment of the Court that you, Lisa Ellen Bifield, are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 84 months.

It appears that you do not have the ability to pay a fine, and so the fine is waived; but you must pay the mandatory $100 special assessment fee, due immediately. If you're unable to pay that, you will be required to work, and not greater than 50 percent of your net quarterly prison income will be taken to pay the fee.

I don't see a forfeiture order with regard to Ms. Bifield. There was not one, was there?

MR. RICHARDSON: There was not one, Your Honor, based on the Count of conviction.

THE COURT: Okay. Upon your release from

imprisonment you'll be placed on supervised release for a term of three years. Within 72 hours of being released you must report in person to the probation office in the District to which you are released, and while you're on supervision you'll be required to comply with the mandatory and standard conditions of supervision that are set forth in Section 3583(d) of Title 18.

There will be three special conditions that you must comply with. You will be required to satisfactorily participate in a substance abuse treatment program, including drug testing as approved by the probation office, to participate in a mental health treatment program as approved by the probation office, and unless you're able to secure stable and verifiable employment, to participate in a vocational training or work force development program as approved by the probation office.

Are there any objections to the form of the sentence, Mr. Lang?

MR. LANG: None from the defense, Your Honor.

MR. RICHARDSON: None, Your Honor.

THE COURT: All right. Ms. Bifield, your plea agreement provided for a waiver of your right to a direct appeal. Only in very unusual circumstances may someone who has given up their right of appeal nevertheless pursue one. But you should discuss that with Mr. Lang. And if you decide

to try to seek an appeal, it must be done by filing a written notice of appeal with this Court within 14 days of the written judgment order that contains your sentence. He will provide you with that deadline.

If you and Mr. Lang disagree about whether an appeal should be filed, you may file your own appeal, but it must be submitted to this court, the District Court, not the Court of Appeals, within that same 14-day period. And if you are unable to afford the services of a lawyer to handle the appeal, you may apply to the Court of Appeals for court-appointed counsel to handle the appeal. Do you understand?

DEFENDANT: Yes, ma'am.

THE COURT: Okay. Does she have a request for a particular institution?

MR. LANG: We do, Your Honor. Coleman, Florida, if Your Honor please. If Your Honor would recommend that, we would appreciate that.

THE COURT: All right.

MR. LANG: In addition, Your Honor, if you would recommend, if you could recommend the intensive drug treatment program sponsored by BOP. And I understand --

THE COURT: You know because of her Count of conviction she won't be entitled to the time off for completing that.

MR. LANG:  I understand that.  And I've discussed that with her, Your Honor.

THE COURT:  All right.  I'll recommend that she be evaluated for the intensive drug treatment program under Section 3621(e).  What about the GED?  Does she want to try to get the GED?

MR. LANG:  Yes, ma'am.

THE COURT:  All right.  And what about any other vocational training?  Is there any particular request?

MR. LANG:  I don't think there's any particular request, Your Honor, at this point.

THE COURT:  Well, that's something your counselor can talk to you about when you get there and they will tell you what's available.  And hopefully you can get into one of the vocational training programs so that you'll have a skill when you get out to be able to get work.  Okay.

MRS. BIFIELD:  Thank you.

MR. LANG:  The only other thing, Your Honor, if we could -- I understand Your Honor doesn't have much control over this -- but if you could ask the Department of Justice, Marshal service not to transport Ms. Bifield to her place of confinement prior to June 7th; that's the day her daughter gets out of school, and she would like to be able to see her and not disrupt her exam period while she might be moved someplace during now and June 7th.

THE COURT:  June the 7th?

MR. LANG:  Yes, ma'am.  Probably not --

THE COURT:  You mean not to be moved by the BOP?

MR. LANG:  Correct, Your Honor.

THE COURT:  Or not to be moved by the Marshals either.?

MR. LANG:  Yes, ma'am.  If that's possible.

THE COURT:  I'll recommend that she not be moved prior to June the 7th.  All right.

MR. LANG:  June 7th, Your Honor.  I'm sorry.  I thought you may have said 2nd.  I'm sorry.

THE COURT:  Right.  Okay.

MR. LANG:  The only other thing, Your Honor; this may not be something the Court can consider.  But my client has a persistent staph infection.  I know I've talked to the Marshal service.  They've been in contact with the Lexington County Detention Center.  It may be something that BOP can deal with it, but it is something of some significance which doesn't seem to be going away in spite of whatever treatment the detention center has been able to offer.  I just bring that to the Court's and the Marshal's attention.  I'm not sure it belongs anyplace in the judgment in a criminal case, but it's certainly something that's significantly affecting or could affect my client's health.

THE COURT:  Why don't I do this.  I recommend a

medical evaluation due to a persistent staph infection.

MR. LANG:  That would be fine, Judge.

THE COURT:  Then when they do her designation, they'll --

MR. LANG:  They'll take that into consideration.

THE COURT:  -- take that into consideration.  I guess you have a reason for Coleman.  It's been my experience, just for what it's worth, that the women who go to federal prison much prefer Alderson to Coleman.

MR. LANG:  Judge, we've gone back and forth on that.  Quite frankly, the decision or the request for Coleman really has to do with the fact that her daughter when she gets out of school for spring break or for winter break, it snows in West Virginia.  And it may then be more difficult for her to get to West Virginia than to Coleman.  And that's really Ms. Bifield's only consideration at this point.  So, I mean, we've taken that into consideration, Your Honor.

THE COURT:  All right. Okay.  All right.  Counts to be dismissed?

MR. RICHARDSON:  There are Counts to be dismissed.  We'd move to dismiss them at this time, along with the remaining forfeiture allegations.

THE COURT:  Okay.  Granted.

MR. LANG:  Thank you, Your Honor.

THE COURT:  All right.  Ms. Bifield then will be

remanded to the custody of the United States Marshal to await a designation by the Bureau of Prisons.  Good luck to you.

MR. LANG:  Thank you, Your Honor.

MS. EVATT:  And, Your Honor, may she remain in here during Mr. Bifield's sentencing since you scheduled them at the same time?

THE COURT:  Any objection from the Marshals?

MS. EVATT:  He has some comments he wants to make in mitigation that are directed towards her, too.

THE COURT:  Okay.  Does that mean we have to have more Marshals in the courtroom?  Would you have any more staff in the courtroom or less staff in the courtroom?

MARSHAL:  We'll need more staff in the courtroom.  Yes, ma'am.

THE COURT:  Okay.  Why don't we do this.  Let him make those remarks and then she can be removed, because it requires more staff to keep them both in here.

MR. BURNSIDE:  Judge, that would be good.  We're going to get Mr. Bifield a -- he was anticipating going last.  But, I mean, --

THE COURT:  Well, he doesn't have to say everything now.  He can speak then again.  But if there is something in particular that he wants to say that affects her, he could go ahead and say that now and then save the rest for last.

MR. BIFIELD:  I just want to say I love you, girl,

and I'm sorry for everything.  Okay.  Please forgive me.

Okay.  That's all.

THE COURT:  Okay.

MR. BURNSIDE:  Thank you, Your Honor.

THE COURT:  All right.  She may be removed at this time.  All right, Mr. Richardson.

MR. RICHARDSON:  Thank you, Your Honor.  The next case is United States vs. Daniel Eugene Bifield, criminal number 3:12-430.  We are here for the sentencing.  The Government has reviewed the pre-sentence report and has no objections to it.

THE COURT:  Okay.  All right.  Good afternoon, Mr. Burnside, --

MR. BURNSIDE:  Good afternoon.

THE COURT:  -- Mr. Bifield, and Ms. Evatt.  Here is what I have.  Okay.  I have your sentencing memorandum and request for 3553(a) sentence consideration.  I have Mr. Bifield's sentencing letter/statement.  I have a proposed judgment and preliminary order of forfeiture that the Government has submitted that seeks to forfeit or seeks a judgment of forfeiture in the amount of $300,000 plus forfeiture of any interest of Mr. Bifield in a 2009 Harley Davidson.  I believe those are the only two items that are the subject of the forfeiture order.  And then I have the pre-sentence report.  Was there anything else that you wanted

me to have?

MR. BURNSIDE:  Your Honor, if I could just kind of state the way I hope to go forward in the hearing.

THE COURT:  Okay.

MR. BURNSIDE:  And then that might clarify it a little bit.

THE COURT:  Okay.

MR. BURNSIDE:  I do have one other item that you may or may not want.  I was going to leave it up to you. Your Honor, I have filed objections to the pre-sentence report.  I termed them all objections.  There were 27 of them.

THE COURT:  Right.

MR. BURNSIDE:  In my opening paragraph I told the probation officer there were four of them that I thought I needed a ruling from the Court on.  And so the probation office filed a response to those four objections.  And the other 23 are listed sort of as commentary, much like Mr. Lang just did in Ms. Bifield's case without a response.  I am not asking the Court for a ruling on that, but I would like to go forward on those four objections.  And I was going to handle that part of the sentencing hearing.  Ms. Evatt was going to argue the motion for the variance in the case.

There are three character witnesses that we intended to call.  Those witnesses are Dorothy Madden who is Lisa

Bifield's mother. Charles Nelson is a very good friend of Mr. Bifield's. And David Gregory Thompson is another friend of his who are going to speak briefly to the Court as character references. And then Mr. Bifield had also written a statement that I think he was -- that he wanted to relay to the Court toward the end of the hearing.

The only -- I have prepared a CD that basically has two of the Exhibits that I would imagine you heard during the trial of the other defendants. And so you may not be interested. And I was not going to play them. They were -- one of them -- but they're both listed in objection 4. One of them is M-14 which is about a little over a three-hour tape that has to do with my fourth objection, and the other Exhibit on the CD is M-21.

And I have stated in my objection the things that I think are important on the disks. And so I was going to tell the Court what I think the tape says. And it's a very good tape, so you can hear it. But if the Court felt -- if you feel like you need some context or something like that, then I have this available.

THE COURT: So in your objection, didn't you have direct quotes around some of the things?

MR. BURNSIDE: I have direct quotes. Right, Your Honor.

THE COURT: And so those quotes are coming from

those clips?

MR. BURNSIDE: They are.

THE COURT: Okay. I can't tell you right now whether I heard M-14 and M-21. I heard an unbelievable number, but I didn't hear all of -- I was only hearing parts of them. And so I don't know whether the parts that you are interested in were played or not.

MR. BURNSIDE: Well, if what I've written allows me to make my argument to your satisfaction, then I'll be satisfied with that.

THE COURT: Okay.

MR. BURNSIDE: These two incidents are May the 12th of 2011 and June the 3rd of 2011. So they were at the very beginning of the Government's investigation, which I think are relevant to some of the objections, or to the objection number 4 that I filed.

THE COURT: Okay. Well, why don't we see how we do when we get to that objection. And then if we have a dispute between you and the Government as to how you have quoted it or how you've characterized it, I may have to listen to a portion of it. If there is no dispute, I probably wouldn't need to.

MR. BURNSIDE: I think that would be the way to go, Your Honor.

THE COURT: Okay. All right. Now, let me make

sure I've got these names right. Your witnesses would be Mrs. Madden, Charles Nelson. Was it David Gregory Thompson?

MR. BURNSIDE: That's it. David Gregory Thompson.

THE COURT: Okay. And then Mr. Bifield?

MR. BURNSIDE: Yes, Your Honor.

THE COURT: Okay. All right. Okay. Let me ask a few additional questions before we get to the objections. Have you, Mr. Burnside, and you, Ms. Evatt, had an opportunity to read, review, and discuss the pre-sentence reporter fully with Mr. Bifield?

MR. BURNSIDE: We have, Your Honor.

MS. EVATT: Yes, Your Honor.

THE COURT: Okay. Mr. Bifield, did you have a chance to read this report and to discuss it fully with your attorneys?

DEFENDANT: Yes, ma'am.

THE COURT: Okay. All right. Now, in addition, the attorneys filed a number of objections to the report and specified that there were four main objections that they wanted to make as formal objections and ask for a ruling on. And then there were a number of other paragraphs where they specified basically your side of the story or your disagreement with something that is in the report but not something that would affect your guidelines or your sentence. Are you in agreement with the way they did that?

DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  And then as a result of the way they did that, the probation office prepared a new document which is called the addendum to the report in which they responded to the four objections in detail and then they listed all of the other points that had been made by you but did not respond to those.  And have you had a chance to read that document, the addendum?

DEFENDANT:  Yes, ma'am.

THE COURT:  And have you had a chance to discuss that with your attorneys?

DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  All right.  You may have a seat, Mr. Bifield.  And, Ms. Evatt, you may, too.  And then we'll go forward with Mr. Burnside's objections at this time.  You want to do it in the order that they're set forth in the addendum?

MR. BURNSIDE:  Yes, Your Honor.  That would be fine.

THE COURT:  Okay.  That's fine.  I wanted to locate something here.  Oh, here it is.  Just out of curiosity, I asked the probation office to do all the various calculations for me on the drug issues.  And so I have a calculation that is the -- you know, obviously I have the one that's in the pre-sentence report in which they include the five pounds of

meth and the cocaine and the bath salts. And in that one, that drug number drives the guidelines and puts you at a guideline range of 360 to life. But because he has a 20-year cap, his guideline becomes 240 months.

MR. BURNSIDE: Yes, Your Honor.

THE COURT: Okay. Then I asked them to do one without -- if you take out the meth, the five pounds of meth, what would it be? And they calculated it as a level 32, criminal history 6, and the guideline range would be 210 months to 240 months. It would have been 210 to 262, but it caps out at 240 because of the statutory max. Then I asked them to do it without the meth and without the bath salts, so nothing but the cocaine.

MR. BURNSIDE: Yes, Your Honor.

THE COURT: And that came out at a level 31, category 6, with a guideline range of 188 to 235 months. And then I asked them to calculate it with the meth and without the bath salts. And that came out at the same as the current pre-sentence report which is the 360 to life, capping out at 240.

And so the point of all that is that it doesn't appear that the bath salts make any difference because you come out with the same guideline range whether they are in or out I believe.

MR. BURNSIDE: I think that is true, Your Honor.

THE COURT: Yeah. And then so the best case scenario it seems to me under the guidelines for him is 188 to 235. Not taking into account your role. I know you have another objection on role. But just on the drug weights.

MR. BURNSIDE: Right. And that's -- the 188 to 235 is what I came out with, too. I wasn't -- I don't know -- you would have to rule not to use the bath salts and not use the --

THE COURT: Meth.

MR. BURNSIDE: -- meth in order to come up with that.

THE COURT: To get to that.

MR. BURNSIDE: That must have some increase based on the multi-count rule --

THE COURT: It does.

MR. BURNSIDE: -- which is pretty complicated.

THE COURT: Right.

MR. BURNSIDE: But I'm not sure I figured the multi-count rules. But I would agree with the computations you just stated.

THE COURT: Okay. All right. You may go ahead with your first objection.

MR. BURNSIDE: Thank you, Your Honor. The first objection, I sort of entitled it: The Fictional Hobbs Act Robbery and Imaginary Meth. I'm not going to repeat

everything that I said in the objection but I did want to address the probation officer's response.

THE COURT:  Okay.

MR. BURNSIDE:  They first cite to 1(b)1.3(a)(1), the definition of relevant conduct which does hold a defendant responsible for jointly undertaken criminal activity committed by a co-defendant.  Well, I mean, that's not what we have here.  We have just a story from a government informant of something he said was going to happen.  So it's not an actual co-defendant.

They refer to application note 2 which says the Court must determine the scope of criminal activity particularly agreed to and jointly undertaken with conduct of others.  So the conduct of others is a little bit broader maybe than the defendant, but I still don't think that conduct of others encompasses something an informant claimed was going to happen that was never going to happen.  So I don't think that that gets the Government there.  And I also don't think that the proof in this case shows that Mr. Bifield agreed to this robbery.

The Government discusses the robbery and says that there was a discussion between Joe the Jeweler and Mr. Bifield. I've listened to those tapes, and I would not call that a discussion.  What you have is Joe the Jeweler saying, I'm going to do this, this and this; and you make up this spiel,

sort the constantly changing spiel, of whether it's going to -- they were going to rob four pounds of meth, five pounds of meth, five kilos of cocaine.  I mean, it was a constantly changing scenario that he was throwing out.

He also threw the scenario out sort of in stages.  He started out just trying to buy gold and things like that. Then he started trying to buy guns.  Later on he comes up with one scenario.  And so I think there's a very real issue of whether or not he was even telling a credible story at all, whether or not his story was believed by Mr. Bifield. So I don't think that this conduct was jointly undertaken by Mr. Bifield.

The probation office seems to concede that there was not an explicit agreement.  I mean, there is not a tape where Mr. Bifield says, yes, I want to do that.  You know, this is how you ought to do it.  You know, this is going to be my share of the robbery proceeds.  There was not a joining in of this thing, this story that Joe was weaving.

He was offering up advice.  He was not finding compatriots to help do the robbery up in New York.  I mean, there was no explicit agreement.  So the response falls back on what they quote, a tacit understanding.  And I don't know what the proof of a tacit understanding is.  I first don't think a tacit understanding is enough to use these drug amounts or this Hobbs Act Robbery in Mr. Bifield's

guidelines.

The response falls back on the fact and the law that reverse stings are illegal. And I've seen reverse stings. I know you have seen reverse stings. I've never seen a reverse sting like this. The reverse stings I've seen have been when a Government agent says, I'm going to sell you some drugs. The defendant shows up, got his money in his hand, he is ready to commit the offense of PWID cocaine. And so he's -- I mean, you know you have a person who is getting ready to not just have a tacit understanding; he is ready to commit the crime.

THE COURT: The ones we see the most often now, the stash house robberies, where they show up with the guns ready to go rob the stash house, there is no stash house. They get arrested when they show up with the guns.

MR. BURNSIDE: Got a client like that right now. They show up. They have conversations. In those conversations they say, do you need me to shoot the guy that's got the drugs? Have I got to prove I'm serious?

It is quite a difference. I mean, that's a reverse sting. It's a government made-up crime. But you at least have a defendant that says, here. I'm here. I'm ready to do it. I've got my guns. I'm ready to perform this act.

And so, I mean, either one of those scenarios have been approved by the Fourth Circuit. And that's a reverse sting.

This is not a reverse sting.  This is maybe a reverse sting three times removed.  And the guidelines do not take that into account at all.

The guidelines treat with -- his guidelines would be exactly the same if Mr. Bifield had gotten in the car with a gun, driven to New York, robbed the drug dealer, took the cocaine to Canada and sold it and kept all the money himself. He would have the exact same guidelines.  And so --

THE COURT:  But he would also have a 924(c).

MR. BURNSIDE:  Well, he may have a 924(c) if he did that.  But it wouldn't change his guidelines.  His guidelines do not --

THE COURT:  On the drug Count.

MR. BURNSIDE:  -- impact the Count.

THE COURT:  Right.

MR. BURNSIDE:  This does add -- you know, I mean, I think it's clear that this guideline as it's used over-punishes what even the Government alleges to have happened.  As I said in my motion, Mr. Bifield never really believed this story, because of its changing nature.  It just really made no sense that he is going to need a .32 caliber pistol from somebody in South Carolina to give to a crew in New York to commit a robbery.  I mean, the whole thing is sort of fantastical.

What Mr. Bifield knew is that Joe the Jeweler was paying

top dollar for a firearm.  I mean, my position here is not remarkable.  I mean, I'm asking that someone be punished for what they did, not for some made up story by the Government agents.

I mean, that's -- and so I think -- and this may go into Ms. Evatt's -- if you do not -- if you overrule my objection, I do think that this is a severe overstatement of the guidelines if you're going to leave in meth that never existed, a robbery that was never committed and was never going to be committed, a robbery that Mr. Bifield had really nothing to do with other than selling a weapon.

And the whole scheme was just a -- the way it was done was sort of sneaky.  I mean, you start somebody out.  Then you're buying the gun.  Then you move -- later on you tell them this story.  Later on you come back with asking them to launder money.

I mean, you know, it's just not -- I don't know. There's something -- there's something about the fairness of it that doesn't pass the smell test.  And Mr. Bifield did not believe this guy.

There are a lot of individuals who are sort of like -- he sort of thought that Joe the Jeweler was sort of a poser, someone who trying to act like a big, tough guy and be involved in things and, you know, just to hang around with Hell's Angels, because there are people that -- and he was

throwing money around, and they were taking it, unfortunately. I mean, it's -- but that's my position on the first objection, Your Honor. Did you want me to go through all of them and then have a response?

THE COURT: No. Let's let Mr. Richardson respond, and then I will rule on that one. We'll go to the next one. Okay. All right, Mr. Richardson.

MR. RICHARDSON: Thank you, Your Honor. This is an instance that Your Honor has seen before where we have repeated discussions about what is taking place; in this case, an armed robbery of drug dealers, specific discussions about that they're, armed robbery, that there were Mexican drug dealers, and that it was five pounds of methamphetamine for the first one that is being discussed. That's paragraph 61, 71, 110, among others.

And that's followed by action by Mr. Bifield, words to -- I beg to disagree with Mr. Burnside -- that Mr. Bifield did in fact agree, encourage this conduct to take place, continually asking, when is the money coming in for me to launder? When are the drug proceeds coming in? But followed by other actions; him supplying additional firearms.

In paragraph 62 he asks specifically, well, once they knock off these meth dealers, I know some guys that can deal the meth. Bring me the meth and I'll get it distributed so you don't have to take it to Canada.

The FBI, of course not allowing that to happen, the FBI doesn't hand methamphetamine over, then comes up with this story that it's got to go to Canada and he can launder the money, because Mr. Bifield requests to get the meth himself to distribute.  That's paragraph 62.

He supplies -- knowing what's happening, he supplies firearms.  He engages in the money laundering multiple times. He coordinates and facilitates the supply of others supplying firearms, like Bruce Long's, the assault rifle Mr. Bifield thought was an AK-47, knowing what he's doing was wrong.

He won't even say it out loud.  He writes it on a piece of paper, says, Bruce Long has got one of these, you know, for what you've got going on.  He writes it on a piece of paper, an AK-47, and then scratches it out, because he's concerned about things being recorded.  His actions show that he knew what he was doing was illegal, that he was part of a conspiracy to do this.

And he is bringing others into it.  Mr. Pryor describes in recordings that Your Honor heard how to Mr. -- in sort of the January/February timeframe, Mr. Pryor describes that the only reason that I am doing this, the only reason I am in this, the only reason I know the informant is because Dan Bifield brought me in and got me supplying these firearms.

So Dan Bifield is bringing Pryor in.  He's bringing Lisa in to supply these firearms.  He is bringing Bruce Wilson in

to supply these firearms. He's bringing Long in to supply these firearms. And then on the back end, he's laundering money, the proceeds. Because law enforcement wasn't going to give Mr. Bifield the meth that he wanted, so they laundered money using him.

And with respect to the laundering money, not only does he believe it but he uses a variety of different people to launder what he believed were the drug proceeds. He used Mr. Rhodus who Your Honor has seen. He used the Maddens who you have heard from and will continue to hear from I believe in a little bit. He used the Carrolls. He used a plumbing company in Connecticut. He used a strip club in Connecticut. He traveled up there, had them write checks, laundering money. Right. These are all things, he wasn't doing it in his own bank account because he knew what he was doing was illegal. He's an integral part of what's happening.

And, Your Honor, as you've explained -- and I'm not telling you anything you don't know -- but I was looking at a recent decision of yours, the United States vs. Avery Sumter. This was a 2255 case. But it was addressing these stash house robbery cases.

And Your Honor went through and explained the very concept that we're talking about, that the essence of a criminal conspiracy is the agreement to commit it and that a defendant can be guilty, as the Fourth Circuit explains in

cases like Minn from earlier this year, be held responsible for the conspiracy even if the object of that conspiracy is unattainable from the very beginning.  Right.

In the context of drug crimes, quoting the Fourth Circuit here, the principals believe the defendant culpable for a conspiracy even if no illegal substance was ever involved.  And you go on to talk about the conspiracy is the distinct evil that may exist and be punished whether or not substantive crimes occur and regardless of the impossibility, factual impossibility of the conspiracy's ultimate objective.

And in cases like Minn from 2013, but other Fourth Circuit cases as well, the court, the Fourth Circuit, has repeatedly indicated that these types of conspiracies to violate laws are appropriately punished by whatever the agreement is.

And here, the agreement that Mr. Bifield entered into was to supply firearms on the front end, an integral part, to launder money on the back end of a drug robbery.  And so we think that is exactly what the case law and the concept of a conspiracy and an agreement and Mr. Bifield's role in it calls for.

The other thing I will add, Your Honor, in the context of this; and again, this bleeds a little bit into the variant argument, but as Mr. Burnside sort of started it, I'll at least mention it now and probably come back to it more later;

is that one of the things that is a little bit of a reoccurring theme here in these cases is that looking just at this five pounds of meth and the weight that's attributed in the pre-sentence report really understates Mr. Bifield's drug involvement.

And the Government didn't object to it because it ultimately believes it doesn't matter. The Government doesn't have a practice of objecting to things that don't matter.

But one thing that Your Honor sees throughout this, like, for example, in paragraphs 128 to 129, that Mr. Bifield is told about and provided kickbacks for David Oiler's methamphetamine dealing. In late February and early March, he's told about these dealings with David Oiler. And David Oiler is dealing substantial quantities of methamphetamine, 50 grams of which he was selling in each deal. 50 grams of the actual methamphetamine that David Oiler was selling is the same offense level that we're talking about for the five pounds of mixture of methamphetamine.

And so while it has not been attributed directly to Mr. Bifield, we think the principle applies. Mr. Bifield was well aware; in fact, was told directly and accepted money as the leader of a group that was supplying methamphetamine. That's David Oiler. It's in the pre-sentence report at 128 and 129.

The pre-sentence report doesn't attribute a specific weight to it and therefore doesn't apply it, but what we know is that every time Oiler was supplying that methamphetamine, it was 98, 99 percent pure, he's supplying three ounces, eight ounces, all of those over that 50-gram sort of threshold amount.

And so if we're really looking at what's foreseeable to him in the context of the drug dealing that was engaged in by this conspiracy, this drug robbery is not outside the realm of what he was certainly actually knowledgeable about; much less, was merely foreseeable to him.

And so I think that is one way in which, as it currently stands, it doesn't overestimate his culpability at all. In fact, it probably understates it, because it doesn't account for what he knew was happening with David Oiler where he was getting kickbacks from each of those deals.

The other thing he doesn't take account of, and I understand in this case probably can't take account of it because it's more amorphous, is the testimony and the evidence included in the pre-sentence report, that this is just a window into what Mr. Bifield was doing, that before the FBI was involved he was supplying cocaine to at least one individual. There is both recordings about it as well as a statement made by the person to whom Dan Bifield was supplying. This is included in the PSR about his supplying

cocaine.

He was supplying guns. Even though he was a felon, couldn't be using or having or possessing guns, he's supplying them. And that's the discussion on April the 14th included in the PSR. Oh, I just supplied three guns to somebody else. Right. When the question is raised about supplying guns, Mr. Bifield doesn't say, well, I'm a felon, I don't do that. He says, I just supplied three guns to somebody. Right. Those aren't taken into account of what we're doing.

The trial testimony that Your Honor heard a great deal about was that he was dealing in stolen property before the FBI got involved. And that process, you know, is not concluded here because it's amorphous as to exactly how much or to what degree it was, as well as the testimony and recordings where Dan Bifield -- and you heard some of these during the trial -- where Dan Bifield is talking with the informant about doing an armed robbery of a jeweler in the Rock Hill area.

They're talking about -- and they use a -- just to refresh your memory, Your Honor, they're talking about a Jewish jeweler. And they use some terms to describe him. But they're talking about knocking off the Jewish jeweler. And that's Mr. Bifield talking about the activities. This is before the FBI is involved.

The FBI gets involved.  At first they hear about this in speaking with the informant about it, and they have to tell the informant in no uncertain terms is that to happen.  Right.  And so, in a sense, the FBI comes in to stop Mr. Bifield from engaging in one type of robbery and then, in essence, gets him to join into a different kind of robbery.

And that's all to say that this is -- the five pounds of methamphetamine here are not outside the scope of what Mr. Bifield well knew and well understood he was getting into as part of this criminal conduct.

And then the final thing, Your Honor, I'll mention just in passing, yet a third way that Mr. Bifield's drug involvement here is understated, is that it only addresses the five pounds of methamphetamine from the December money laundering, the supply of guns in primarily July, August and September, the money laundering in the November 29th, December 22nd, December 23rd timeframe.

It does not attribute any drug weight for the attempted money laundering when Mr. Bifield took $15,000 from a five-kilo drug rip, alleged five-kilo drug rip, in March, March the 1st of 2012.

Now, Mr. Bifield never actually laundered that money.  He agreed to do it.  But the pre-sentence report, I think appropriately, because the five-kilo figure was never expressly stated to Mr. Bifield.  He was told the money was

coming from another drug robbery like the one that had happened previously, but he wasn't given an exact number. So the pre-sentence report I think appropriately doesn't attribute an actual weight for Mr. Bifield on that involvement in the second robbery, but he's certainly aware of it. He certainly agrees to engage in that money laundering.

And so I think far from overstating, you know, what was part of his understanding, part of the conspiracy; in this case, I think the five pounds of meth that we're talking about substantially understates it.

THE COURT: All right. Any response to that, Mr. Burnside? Not necessary, but if you wish.

MR. BURNSIDE: Well, a large degree of that is things that have not been used. I feel a little bit like I've been sandbagged, because a lot of that is not included in the guidelines. And I have checked the things that impacted the guidelines, would have thought the Government would have objected to things that they think enhance the guidelines. And so, you know, I did not object to the things he did, to get into those factual details, but I'll try to respond as best I can.

First of all, with regard to the $15,000 and to the alleged quote from Mr. Bifield, I robbed a jeweler; on both of those two items, Mr. Bifield had some serious suspicions

that Joe the Jeweler was an informant. And he was trying to find out. Because he knew if he was an informant, he would not bring him -- he would not give him any drugs and he knew that there would not be a robbery. All he had to say is, let's go rob the jeweler, or something to that effect, and that would be the end of it, because he was an informant. These are not things that he was actually going to go forward with.

He did take that $15,000. He knew that was government money. He knew that was not the proceeds of a drug ripoff in New York City. He took it. He kept it. And, you know, if anything, I guess that would be fraud. He took -- but it's -- that $15,000 was not money laundering. He didn't provide any checks or anything like that. I'm not aware of --

THE COURT: I think what Mr. Richardson's argument was focused on is, if you're worried that five pounds of meth overstates his responsibility with regard to drug weight, you know, there was a lot of other stuff that could have been used that we didn't push. And, you know, I'm not looking at that.

MR. BURNSIDE: Okay.

THE COURT: I'm looking at whether the five pounds of meth itself, on its own, can be used as drug weight.

MR. BURNSIDE: And that's the issue that I tried to

frame, because that's what was used against him.

THE COURT: Right.

MR. BURNSIDE: So the other things, you know, may be appropriate for Mr. Richardson to bring up in response to the --

THE COURT: Variance.

MR. BURNSIDE: -- variance question.

THE COURT: Right.

MR. BURNSIDE: I'm not saying he has said anything inappropriate. I don't think it answers the objection here. I don't think -- I mean, I've read the Minn case and the Sumter case. The facts are not like this case. Those are different kinds of reverse stings than what this is.

This is a fairly substantial extension of the whole concept of reverse stings. When an informant can just claim, this is what we're going to do, then you have an individual selling a gun, this is how it's going to be used by my crew; and you come up with a big story and then you -- I mean, you might as well let the informants do the sentencing.

I mean, if that's all it takes, is they can spin a yarn and then that's how the guidelines get written up, there's something wrong with that. So, you know, I take exception to the five pounds of meth being added in with the other things that are in this.

THE COURT: Okay. All right. I looked at this

very carefully, and I am going overrule the objection. I have looked back to see exactly what Mr. Bifield was told both before the alleged robbery and when he was asked to supply the firearms and then after the alleged robbery when he was asked to help with laundering the money.

And in some instances with some other defendants there is very sketchy information as to what Joe the Jeweler told them and when he told them, these amounts. But not so as to Mr. Bifield. Because there were a number of conversations, and Joe did not change his story on this as he did with some others. He stuck with five pounds of meth. He mentioned it more than one time. It was explicit.

And so in this situation, I believe that this meets the requirement that was approved by the Fourth Circuit in the Minn case where there was evidence to establish that there was an agreement or a plan and that the plan was to steal five pounds of meth from some people in New York and that they needed the tools to steal it and then they needed the help with laundering the money that came from it.

I agree with you. It's sort of one step removed from a normal stash house case where the defendants actually show up to do the robbery. I agree with that. But the issue about stating the amount is no different. In the stash house robberies the informant is told by government agents what to say about how much cocaine there is going to be at the stash

house or what he normally gets when he goes to the stash house and how much is normally seen there.

And so that's really an indistinguishable factor between those cases in which the Fourth Circuit has approved the use of such a method of setting a sentence under the guidelines and those like this one. So it's a distinction without a difference I think. And so for those reasons, I overrule the objection.

I find that by a preponderance of evidence there is evidence that there was a plan and that Mr. Bifield was aware of the plan and that he agreed to assist in the plan by providing the weapons and assisting in laundering money after the alleged robbery took place.

All right. The next objection is on page 3 of the addendum. This is the -- it looks to me like mostly what you're upset about here is this alleged running of a prostitution ring and then the other issue concerning an objection that relates to Ms. Anderson, Mr. Long's wife.

MR. BURNSIDE: Yes, Your Honor.

THE COURT: I don't really -- you know, this whole issue of the prostitution ring, it was just -- I mean, it's a non factor as far as I'm concerned. It doesn't really have any bearing on my determination of a sentence here.

MR. BURNSIDE: Judge, and the only -- the reason, I mean, it did upset Mr. Bifield because there was no

prostitution ring.  There was no evidence of one other than this one statement by Mr. Keach about some girls that -- and from what I understand, he was making these statements, sort of a recruiting pitch to the confidential source from Lexington, you know, trying to let on that they would have a prostitution thing going.  I don't think there was any real proof of a prostitution thing.  But if the Court is not going to consider it, then I am satisfied with that.

THE COURT:  I think there are much bigger issues here to worry about.  And on the Anderson thing, if you -- I don't know -- it doesn't affect his guidelines at all. Unless you're saying -- as I understand it, it wouldn't affect his guidelines.  He is attributed that cocaine weight, but it's just a question of who provided it, not whether it was provided.

MR. BURNSIDE:  Right.  I mean, his -- he has consistently stated that this did not come from Bruce Long. I mean, Lisa did provide the cocaine.

THE COURT:  Right.

MR. BURNSIDE:  But he --

THE COURT:  And as I understand it, there have been just inconsistent statements about that, that originally Lisa Bifield did say that it came from Ms. Anderson.  Well, it came from Mr. Long via Ms. Anderson.  But then she later said it did not.  And as a result of that, they dismissed the

charge against Ms. Anderson.

MR. BURNSIDE: And of course the earlier statements were closer to her arrest. I think she was going through some withdrawals from drug usage. The later statements were made as substantial prejudice to herself, because the Government wanted to believe that it came from Ms. Anderson. And that was the whole reason the pleas almost blew up. So that --

THE COURT: But, I mean, you're not objecting to the weight. You're just objecting to --

MR. BURNSIDE: The source. That's all.

THE COURT: To the source. And the source is irrelevant at this point for purposes of his sentencing. I'll be glad to make a finding on that if you want one, but you're probably not going to like it.

MR. BURNSIDE: There's no sense making it then, Your Honor.

THE COURT: I have to say I tend to believe what Lisa said the first time around. It had certain indicia of credibility and specifics.

MR. BURNSIDE: All right. Thank you, Your Honor.

THE COURT: Okay. All right. The next one is the drug weights. This is the bath salts issue.

MR. BURNSIDE: Judge, I guess the nub of my objection is on the bath salts question, first of all, in the

tapes you can repeatedly hear the confidential source from Rock Hill asking Mr. Bifield to either take himself, mix these bath salts with cocaine, re-compress it, get it to him or find somebody that can do that, and he suggested that Trouble would do it.  The source said, get Trouble to do it.

Mr. Bifield repeatedly refused to do that.  Bath salts were legal at this time; whereas, you know, of course mixing that would have been illegal.  And so, as I state in my objection, Mr. Bifield never really believed that the source was mixing the two substances together, mainly because it wouldn't make any sense to do that type of thing.

The reason it wouldn't make any sense, that there were 748 bottles of bath salts sold.  They were sold for ten dollars apiece.  Each bottle had half a gram of bath salts in it.  So there were -- in this case, there were 374 grams of bath salts sold.  They were sold at ten dollars for a bottle, so $20 a gram.

So if you were looking at buying a kilo of bath salts, you would spend $20,000 on a kilo of bath salts.  So, I mean, there is no way that a person is going to take bath salts which is a substance that you can get high off of by itself and mix it with cocaine.  I mean, you don't buy cut for $20,000 a kilo to mix with cocaine.  And so the whole story never really made sense.

Mr. Bifield takes the position that the drugs that he

should be held accountable for are only the time he went and sold cocaine along with Lisa and the others that Lisa was responsible for. Those are listed in paragraphs 72, 83 and 98. And it comes up to a total of 560 grams of cocaine. Half a kilo is what's involved there.

I think a fair listening of the tapes is that he did not want to be involved with cocaine. He was very reluctant. He repeatedly tried to convince Joe he ought to be in the bath salts business, not in the cocaine business. Joe kept coming back to making the cocaine a part of it.

In the probation officer's response to this, to my objection, they cite Subsection (a) to the drug table which really supports my objection. I appreciate them citing it. It basically says that unless otherwise specified, the weight of the controlled substance set forth in the table refers to the entire weight of any mixture or any substance containing the technical amount of the controlled substance.

So, you know, this was not sold as a mixture. I mean, I think if you had any other defendant caught selling a kilo of cocaine as a kilo of cut he's going to throw in with the deal, you would be sentencing him for the kilo of cocaine. You would not be sentencing him for the kilo of cut that he gave, knowing full well that the purchaser might take it and mix it. But that's not what the guidelines envision. They say you take the weight of the mixture.

If the Court is not inclined just to hold Mr. Bifield responsible for the cocaine that he and -- that came from him or Lisa, because you do use reasonably foreseeable amounts, the total amount of cocaine actually purchased by the Government is about 1.1 kilos.  That includes everything that Bruce Long did.

Now, I cited in objection 4 Mr. Bifield was not informed about everything that all of the defendants were doing.  They took active steps to keep it away from him, some of the drug dealings, particularly after about September of 2011.  He had introduced Joe to various people.  Joe went directly to those people for his transactions.

He would come back later because he was trying to help set the guidelines and give Dan money.  He made a deal somewhere.  He'd come back to Dan and say, well, I had a deal with so-and-so, or I did something with so-and-so, and give him money.

So, you know, I think that is -- I don't know if you'd call it sentencing manipulation.  That's what was happening, is they were coming to Dan every time there was a transaction and giving him money, and then they can argue that he should be accountable for everything that everybody was doing.  That's really all I wanted to say on that objection.

THE COURT:  All right, Mr. Richardson.

MR. RICHARDSON:  Your Honor, just briefly.  Again,

the instances in which the bath salts were attributed are instances where Mr. Bifield was told what was happening and supplied the bath salts and supplied the cocaine. This is similar in context as to what is foreseeable or understood or known by the defendant as part of his relevant conduct.

It comes up most commonly in the context of whether the powder cocaine is being converted to crack cocaine. And all the time what we present to juries and to the judge is this individual was selling powder cocaine but he knew the user was converting it all, converting 50 percent of it or converting 90 percent of it to crack cocaine.

And if you know the powder is being converted to crack cocaine, even if it turns out that it's a CI that's doing the buy on that particular time, both the Court and juries all the time say, well, it's foreseeable to him that this powder was turning into crack. It's the same principle that's applicable here. I can get into, I do think it makes sense -- I'm sorry.

THE COURT: My question is as to Mr. Burnside's argument, that because this was never mixed, you can't use the mixture rules. In other words, you have to just use the cocaine and can't count the bath salts.

MR. RICHARDSON: That's the same thing --

THE COURT: Under the drug chart.

MR. RICHARDSON: I think it's what the mixture is

for that purpose. In a conspiracy case, the same way the mixture of methamphetamine, there was no methamphetamine; it didn't exist in the robbery context, the mixture that's referred to there is what the understanding, what the agreement was, this conspiracy. So the mixture that's being referred to is not either of the two different ones. It doesn't matter whether they go together or not. It's what the agreement was. That's what a conspiracy punishes.

And so here the mixture that's being described, the one that's agreed upon, is the bath salts with the cocaine. It doesn't make any difference whether it's a factual impossibility. It's the same thing with crack. If the informant never actually cooks the powder cocaine into crack cocaine, but the defendant knew that that's what was happening, he is attributed crack cocaine weight, even if the FBI didn't sit in their lab and convert it. Right. The question is a conspiracy. What is the agreement? What's the scope of the agreement? What's his understanding? And here his understanding was that it was a mixture.

THE COURT: All right.

MR. BURNSIDE: Judge, I mean, there's a big difference. I mean, when you're looking, if you were using a crack analogy, you're talking generally about historical weights. I mean, you come up with an estimate based on what a defendant has turned into. A defendant has changed the

substance from cocaine to crack.

That's not at all what we're doing here.  We're talking about things going forward.  And crack has a guideline.  Bath salts does not have a guideline.  Bath salts at this time was a legal substance.  And so I do not think that it holds that bath salts should be -- that you add in the bath salts.

THE COURT:  All right.  The Court overrules the objection.  I agree with the probation officer's analysis of this that is set forth in the response in the addendum on pages 6, 7 and 8, that both the weights of cocaine mixture that have the bath salts added in in the chart that are in the PSR are the appropriate weights under the guideline rules and that the mixture is appropriate here because there were discussions as to how much bath salts were needed to mix with the cocaine, that Mr. Bifield was present for discussions asking about Mr. Long supplying a half kilo of cocaine.

They discussed the eight ounces of cocaine that they wanted to obtain from Bruce Long along with the containers of bath salts, and the purpose was to mix the two and sell it. And whether Mr. Bifield believed it or not, he supplied the bath salts with the understanding that that was the purpose of what he was supplying, that they were going to be -- it was going to be mixed with cocaine and sold.  So he is responsible for those weights.

All right.  The next objection is the role adjustment

rate, the four-level enhancement under 3B1.1 for leader and organizer.

MR. BURNSIDE:  Judge, I cited two dates, the tapes from May the 12th and June the 3rd.

THE COURT:  Right.

MR. BURNSIDE:  Because I think the May the 12th tape does show that Mr. Bifield was reluctant to get involved in this scheme with Joe.  What Joe tries to tell the defendant, how he can make profit off of the Hell's Angels, and Mr. Bifield refuses to have any part of that.  Then Joe tells the defendant that someone in his group is selling crack cocaine in exchange for gold and then selling it to him.  Mr. Bifield says that's not the direction that the club needs to go.  There are numerous instances when he tells Joe that they are not involved in these types of things.

After that meeting, the recorder continued to play as Joe meets with law enforcement.  And he says there is no organization whatsoever.  He's giving his assessment of whether this is a criminal organization or not.  He talks about the defendants and how dumb they are.  Mr. Bifield he says is unbelievably dumb.  You know, there was just really nothing much going on other than some isolated incidences of illegal conduct.

On June the 3rd Joe comes back to meet with Mr. Bifield.  One of his comments is, you guys have to be better organized.

So there is not an organization. And then Joe proceeds to organize. Joe is the one that comes to them and says -- well, when he says, you guys have to be better organized, the first thing out of Mr. Bifield's mouth is, we ain't doing drugs, we ain't doing guns, we ain't doing all that. We don't have a bar. What do we have? And then Joe makes his pitch. This is how we do it in the Mafia. You have to pay up to the top dog. And so he is the one that comes up with this scheme of paying kickbacks to Mr. Bifield any time anything happens.

And, you know, that's the tragedy here, is that Mr. Bifield, he wanted money, he needed money, and so he ended up taking all these kickbacks from the Government.

So I guess my first point is, Joe -- that Mr. Bifield was not the organizer here. If anybody is the organizer, it was Joe. He's the one that came up with the crimes that were going to be committed. He proposed them. It was not Mr. Bifield or anyone else going to him saying, you know, buy these guns, go let them be used in crimes.

He proposed the crimes. He had complete control of the timing of when these transactions were going to happen. He chose the crimes. He tried to get Mr. Bifield to give him a gun with no numbers. He repeatedly asked for that. He never got that from Mr. Bifield.

I cited in my objection five different tapes where

information is being kept from Mr. Bifield.  Joe is going around him and intentionally dealing with people and keeping Mr. Bifield out of what was going on, and he'd show up later to pay a kickback.  And that was kind of the way he was doing this.

The probation response basically focuses on Mr. Bifield as a leader of the Hell's Angels.  He is the leader of Hell's Angels, but this is not a prosecution of the Hell's Angels.  This was a plea to an association; in fact, conspiracy.  This is a group of individuals some of whom happen to be Hell's Angels.

So the fact that he has been a Hell's Angels for 38 years, I mean, he considers the Hell's Angels to be his family.  Better or worse, he is a Hell's Angel.  He hopes to remain to be a Hell's Angel until he dies.  But that does not make him the leader of this conspiracy; in fact, these individuals.

Judge, this four-level role enhancement, it takes a guideline that I contend is already skewed and skews it way worse, because they have taken the four-level organized leader and putting it on top of the six levels that came from the fictional meth.  And I don't think there is anybody -- I don't even think Mr. Richardson can argue that Mr. Bifield was the organizer or leader in this fictional crime that was going to have happened in New York.

I mean, so you take -- I mean, if you're going to add a four-level, maybe you should add it to everything but that six levels. I mean, once you increase it for conduct he clearly, if anything, had a minor role or a minimal role in, but you add the four levels on top of that, then that clearly skews the guidelines even further. And so I do think that that would result in injustice here.

THE COURT: All right. Mr. Richardson.

MR. RICHARDSON: Thank you, Your Honor. The tapes that Mr. Burnside talked about -- and Your Honor listened to all of these, so I'm not going to belabor them -- I think what those tapes do indicate is that Mr. Bifield was reluctant to get involved with Joe who was not a member of the Hell's Angels. It wasn't that he was reluctant to get involved in criminal activity.

And we know that. I talked about it a little bit earlier. Maybe I should try to keep closer to the objection, but Mr. Burnside keeps arguing variance issues, and so I'm trying to respond. I understand you're looking at a narrow issue here.

But because in the beginnings of these deals he is reluctant to get involved with an outsider who is not a member of the Hell's Angels. It's not that he's reluctant to get involved with drugs, guns, and money laundering. We saw that in his prior drug dealing before the FBI was involved,

the gun dealing he was engaged in before the FBI was involved, or the informant was involved as an agent, FBI informant; the money laundering that he discussed engaging in, the robbery of the jeweler that he discussed engaging in. So it was a reluctance to get involved with an outsider, not a reluctance to get involved with criminal conduct.

The role in the offense here though, I think there are two different ways of looking at it. And so I'll try to talk about those two, and I'll do this relatively briefly I hope. And one is to talk about Mr. Bifield's role in the offense. That is the Rico conspiracy, Count 2. What is his role in the offense? And I think that's the proper inquiry. And I want to talk a little bit about that.

Then I want to talk about secondly, just in sort of supporting that concept, is his role within the sub offenses. He was involved in six or so different sub offenses and his role in each of those. And I think the first inquiry is the right one. What is his role in the offense of conviction, that being the underlying Rico conspiracy? But I think it would apply the same if you try to break it out and look at each specific activity that he was engaged in.

First of all -- and I'm sort of using the factors set forth in application note 4. Your Honor is familiar with them. I'll just sort of tick through them. He exercised decision-making authority as the president of this Hell's

Angels charter until about May of 2011. He was booted out. All the members voted against him, except for Jason Fogle. Everybody else -- or excuse me. Except for Hollywood. Jason Sturgil, not Jason Fogle.

Everybody else voted against him and installed Mark Baker to take his place as the president of the Hell's Angels. But he remained as the vice-president. He exercised decision-making authority as that. And I'll come back a little bit to what that translates into.

But I think Mr. Burnside sort of summed it up in the last objection when he was describing what Mr. Bifield did. He said with respect to the drugs, Allen described Mr. Bifield as introducing others to do the deals and then getting paid on the back end. And that's sort of -- when we talk about recruitment and introduction, which is one of the factors, one of the primary factors, that what Mr. Bifield was doing was sort of recruiting others in, introducing them and facilitating their activity; bringing in Lisa Bifield, most plainly.

And while Ms. Bifield's activities here were very serious, I think that the evidence is fairly clear in showing that but for Dan Bifield's involvement and Dan Bifield's influence over Lisa Bifield, Lisa Bifield would not have been committing these crimes, that Dan Bifield's influence drove Lisa Bifield into these crimes. Whether that was through

just verbal or some of the physical abuse engaged in is an unknown question to us, but he certainly drove her into this dealing.

Bruce Long, the explicit conversations in August and September where he talks about bringing Bruce Long in and letting Bruce Long take over the drug side, supplying the cocaine, so long as -- and this is, you know, like the August 23rd conversation where he says, you know, it still comes back to me but he is going to handle the drug side, that "he" is referring to Bruce Long. Fred Keach who he brings in to carry firearms for him on various instances and gets him involved with the informant. Diesel, who Your Honor is familiar with he's obtaining the guns from, Diesel eventually becomes wary about all the guns that Dan Bifield is trying to obtain through him.

But, you know, certainly the recruitment and introduction to the conspiracy here is through Dan Bifield. From early on we see Dan Bifield bringing Joanna Looper involved, getting her involved. Ultimately, once there's a falling out between the informant and Mr. Bifield, Mr. Bifield instructs Looper to not deal any longer, any further with the informant on April the 25th, telling her she cannot sell him the pills. That's both on the recordings. It's also confirmed in statements that Lisa Bifield made. All this is included in the pre-sentence report.

Bringing in a variety of people in recruitment, and I'm not going to go through all of them, but the money laundering individuals, we talked about Rhodus and Kevin O'Halpin and then the Maddens and the Carrolls and the plumbing company and the strip club, bringing in the arson participants.

We talked about Lisa again who was the driver for that arson as well as two other associates of the Hell's Angels who were involved in assisting Dan Bifield in setting the fire.  That's the recruitment and introduction into the relationship with the informant and the Rico conspiracy.

Here, it's about Mr. Bifield's knowledge about these deals and getting a cut of it.  Mr. Bifield -- counsel suggests that the Government is the one that came up with this idea.  Far from it.  Mr. Bifield first -- and Your Honor heard these recordings and we talked about them a great deal during the trial.  Mr. Bifield is the one who first said, it has to come back through me.  I've got to get a cut.

In May, he brings up the concept of Diesel was paying a cut back to the club, that this is the conversations that Mr. Bifield said.  And the informant asked him, what do you want me to do?  And he, Mr. Bifield, explained, well, you can do deals with my guys but every time you just give me a little something and I'll give it back to the club.

And so he had knowledge about it.  August 23rd he said, everything has to come through me.  September 7th, when the

informant brings up -- and this is Paragraph 103 -- the informant brings up, I've been doing deals with Keach and Long, and Bifield cuts him off and says, yeah, I know all about it. I know all about it. So he's clearly aware of what's happening.

January 5th, for example, he explains to the informant that he knows what he's doing and he's discussed the informant with his guys, discussed that he's sick, including that he trusts him. And that's also the conversation where Mr. Bifield describes that while the Hell's Angels is about the brotherhood, it's also really about the money; and I think sort of reveals sort of where he was trying to take the Hell's Angels in this particular instance.

Mr. Burnside refers to a few instances where this suggestion, well, don't tell him this or don't tell him that, the January the 5th conversation is the same one where Mr. Bifield describes the golden rule of the Hell's Angels as silence, that you don't talk to law enforcement, you don't talk to others about what you're doing.

When looking at his role in the conspiracy as a whole, I won't go through all of them, they're set forth here, but the violence he engaged in and the threatened violence; in particular, I'm at least referencing here paragraph 79 where Bifield showed up and threatened the Grim Reapers and said that he was going to beat them down if they had any

affiliation with the Outlaws; 137 to 138, talking about an instance where he beat some people up; 198, where again, there's an incident where he beats somebody up in a bar; and that's all part of this sort of overall Rico enterprise.

Just briefly on the sub offenses, without sort of trying to go through every little piece of them, that his role in them was as a leader at each level. We talked about the arson, that, you know, he was the leader of that, you know, four people that were involved in burning the club down. And the drug business, the cocaine distribution, he started out having Lisa do it. Then he got Bruce Long to do it. And he was still getting the money off of it.

We have talked about his involvement with Looper. And with respect to the firearms, we talked about his getting Diesel involved, Lisa involved, Pryor involved, Bruce Long involved with the AK-47 we talked about. Earlier, in paragraph 59, he talks about gun deals. He's got to have somebody come with him to carry the guns. Again, this is the leadership role that he's playing.

With respect to Pryor's gun deals, like in Paragraph 109, he tells the informant he knows what's going on and that he needs part of his cut for him. He'll still give some to the club but he needs money for himself as well.

The money laundering, we've talked about how he brought in the variety of people that I've named to have them write

the checks. All of these are different sort of aspects of his leadership of the offense that he's engaged in here at each level of it.

With respect to the robbery aspect of this, sort of specifically, because Mr. Burnside brought that up, he was a leader in obtaining the firearms. Right. He used assistance from Keach and Lisa. He directed and was involved in Bruce Long's.

And then on the money laundering, which is the washing money from the proceeds, he's a leader there, too. He's not a leader of the robbery crew because there is no robbery crew, but he's a leader in getting Lisa and O'Halpin and Rhodus and the Maddens and the Carrolls and the plumbing company and the strip club all doing this activity.

And so we think within that group he's still a leader, even within the subgroup of just the robbery aspect. But I think however you cut it, I think the role was appropriately applied by probation.

THE COURT: All right. Mr. Burnside, anything else?

MR. BURNSIDE: A couple of things, Your Honor. The first thing we would object to, I'm not sure where Mr. Richardson was getting his information that Mr. Bifield was voted out of the club. He stepped down as the president in May. He was not voted out.

He denies physically assaulting Lisa.  Her mom is here to speak for him.

THE COURT:  That's a pending charge, right?

MR. BURNSIDE:  It's certainly -- I'm not sure --

MR. RICHARDSON:  It is pending.

MR. BURNSIDE:  -- if it's dismissed.

MR. RICHARDSON:  It is pending.

THE COURT:  He's not been convicted of that.

MR. BURNSIDE:  No, Your Honor.  He's not.  There is a tape where Mr. Bifield says, I don't have to get a cut.  I can't give you the exact date.  But he was asked by the source about money, about paying him something.  And he said, I don't have to get a cut.  So he was not demanding the money.  The informant is the one who came up with the idea of paying him.

As far as Ms. Looper not wanting to deal with the informant, the informant was repeatedly calling her and harassing her, trying to get her to bring him more of those Clonopin pills that she had gotten from someone.  She called Mr. Bifield.  He didn't forbid her from dealing with him.  He told her that he wouldn't deal with the informant.  So it's not a situation where he forbid that or controlled that.  He contends that he made introductions.  He was not recruiting for the informant.

An example, on January the 5th, when Mr. Baker showed up

with Mr. Bifield, that's when money laundering came up. Mr. Baker said he didn't know anything about it. We heard him on the tape saying he did not know about it. So Mr. Bifield had not prepped him for this to take some of the money.

I'm not objecting to the role of enhancement for the arson. We're not objecting to the arson in any way. But we think that any role enhancement, it should be only on the arson and nothing else. That's it, Your Honor.

THE COURT: All right.

MR. RICHARDSON: Your Honor, just because he said that I didn't have information for it, I literally was quoting paragraph 44 where it says he was voted out as the president of the club.

THE COURT: But he denies that.

MR. RICHARDSON: Right. I understand that. I didn't want Your Honor to think I was making it up.

THE COURT: Okay. All right. That's not a factor for me to be concerned about.

All right. I overrule the objection. I find that applying 3B1.1 to this case under Subsection (a), the four-level increase is appropriate because Mr. Bifield was a leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive.

The criminal activity here that I'm defining is not the club. The criminal activity that I am defining is the

activity that occurred during the time of this investigation in which after meeting the informant Mr. Bifield acted to introduce, recruit, facilitate, and otherwise organize the activities of others who were variously recruited to provide firearms, drugs, and to be involved in money laundering; and then also, as you indicated, his particular involvement in the arson scheme that is my understanding Ms. Bifield was involved in somewhat and two others.

So when I count up the number of people that I would say he was directly involved in either recruiting or recommending or asking, soliciting, or controlling, I would include Lisa Bifield, Fred Keach, Bruce Wilson, Bruce Long, at one point David Oiler, Robert Pryor, Joanna Looper, and the others that I don't know the names of who were involved in the money laundering and the arson with him.

So I find that he did exercise decision-making authority, that he was -- the nature of his participation in the commission of the offenses was more as a facilitator in the sense that he made the introductions, he vouched for the informant with these others, at least up to a certain point when he began to suspect and then he seemed to sort of withdraw from active participation.

He did have -- he did recruit accomplices.  He did claim a share of the fruits of the crime, not so much necessarily for him, although he did keep some of the money himself.

It's my understanding though that most of the money that he received as kickbacks was kicked back to the club.

MR. RICHARDSON:  I think the evidence is that some of it was kicked back to the club.

THE COURT:  Some of it was kicked back to the club.

MR. RICHARDSON:  I don't know whether I could say that it was most.

THE COURT:  Okay.  He was involved in a significant level in planning or organizing the various activities, and he did exercise a significant degree of control and authority over others.  They would not have done this had he told them not to do it.  That was clear from the trial and from the tapes.  And either because of his persuasion or because of their respect for him or whatever he had, he did have significant influence over the others who participated in this.  So for all those reasons, that objection is overruled.

All right.  We now have those other 23 items.  As I understand it, those are just there for information and I'm not being asked to rule on those.  Correct?

MR. BURNSIDE:  Your Honor, that's correct.  The addendum will be included with the pre-sentence report whenever it goes forward from here?

THE COURT:  It will.

MR. BURNSIDE:  Okay.  Then that will cover it, Your Honor.

THE COURT: Okay. All right. So, with that then, the Court adopts the factual statements contained in the report as its findings of fact. We have a total offense level of 37 with a criminal history category of 6. The guideline range becomes 240 months. The supervised release range is one to three years. The special assessment fee is $100.

Given my rulings on your objections, do you agree that those are the correct guidelines, Mr. Burnside?

MR. BURNSIDE: Yes, Your Honor, given your rulings.

THE COURT: Mr. Richardson?

MR. RICHARDSON: Yes, Your Honor.

THE COURT: Okay. All right. Now, I know we're going to go to Ms. Evatt's part, but I think we need a break. So let's take ten minutes. And then we'll come back and go into the mitigation portion and hear from the people. If you want to call those witnesses first so they don't have to -- I mean, if they're going to stay anyway, that's fine. But if they're getting tired and they want to speak and leave, that's fine, too.

MR. BURNSIDE: We'll ask them, Your Honor.

THE COURT: Okay. All right. We'll take ten minutes.

(WHEREUPON, a break is taken.)

THE COURT: Before we get started with the

mitigation and variance issues, are there any objections to the judgment and preliminary order of forfeiture that has been submitted by the Government?

MR. BURNSIDE:  Your Honor, under the Criminal Justice Act, we don't represent Mr. Bifield on that motion. We represent him on his liberty interest, not his property interest.  I know he's got 30 days to respond to that motion. So I would like for him to have that opportunity.

I have spoken with Mr. Richardson about the return of other items that really don't have much or any monetary value.  And I think they're going to cooperate with us in turning those over.  So I'm going to try to get a statement from Mr. Bifield as to who he would want to have that property turned over to.

THE COURT:  I saw somewhere in the pre-sentence report or in something that I read that the money for this Harley Davidson was put up or loaned to him from someone.  In other words, there might be someone -- he may have an interest I suppose.

MR. BURNSIDE:  I think there is a loan, a commercial loan with a bank.

MR. RICHARDSON:  He just signed the note.  I think Mr. Castle signed the note along with Mr. Bifield.  There is a financial institution.  I believe they have been in touch with Mr. Ragsdale already.  Obviously their interest would be

taken into account.

THE COURT: Right. Well, this was not filed as a motion. This was filed as a proposed judgment and preliminary order of forfeiture. So what you're saying is that he does not agree to it and that he wants them to file a motion? I would think that would be necessary. Or they could simply file a motion and attach this proposed order to it and then that would start the time to run. What do you say, Mr. Richardson? This was not covered in the agreement?

MR. RICHARDSON: It is covered in the agreement. He did agree to agree to the forfeiture, which this is what it is. Obviously if he does not agree to it, we think that's yet another thing Your Honor ought to take into account as part of his sentencing.

THE COURT: Well, but did the plea agreement say that he was going to forfeit these specific -- you know, a judgment in a specific amount?

MR. RICHARDSON: It says that he agrees to the forfeiture. That was what was in the -- this is for him what was in the indictment. This is what's listed there. For Count 2, these are the items are his that were listed in Count 2.

THE COURT: Well, but was there in the indictment a mention of 300,000?

MR. RICHARDSON: Yes, Your Honor.

THE COURT:  Okay.  I didn't recall that.

MR. RICHARDSON:  I can -- that is on page 88 of the indictment.

THE COURT:  Okay.

MR. BURNSIDE:  Judge, the plea agreement does not specifically state the motorcycle or the $300,000.  This was something that was filed yesterday.  We've not even really had a chance to discuss it with Mr. Bifield from that standpoint since we got that.

THE COURT:  The thing is, this is a criminal forfeiture.  I don't understand why you say you all don't represent him.  Because it's part of the indictment.  It was part of the plea agreement.  And if I don't do it as part of the judgment order, then I have to bring him back for another continuation of the sentencing hearing to resolve this.  I think it's a 90-day window that I have under the rule that allows me to defer the forfeiture.  Or maybe that only applies to restitution.  But in any event --

MR. RICHARDSON:  I'm not sure.  I don't think you can enter a judgment until the forfeiture is resolved.  And certainly the Government --

THE COURT:  Right.  It delays the entry of final judgment.  It certainly delays the entry of final judgment and delays the entry of designation.

MR. BURNSIDE:  We certainly want to accommodate the

Court.  I have had this conversation with Mr. Small about what is the office's position on forfeitures.  And the Criminal Justice Act is, his understanding and mine, too, that we are appointed under the Criminal Justice Act to represent someone's liberty interest, not their property interest.  I may want to talk to him and clear it up.

THE COURT:  So what if -- I mean, like the rest of us who went to trial, we had -- this went to the jury.  So what if you had been representing Mr. Bifield at trial and then we got to that stage three, phase three, you're going to stand up and say, sorry, we're not his lawyer now?

MR. BURNSIDE:  I doubt we would do that.  I'm pretty sure we wouldn't do that.

THE COURT:  I wouldn't think so.

MR. BURNSIDE:  And there may be some way we can work this out, too.  We just haven't had a chance to go over it with Mr. Bifield.

THE COURT:  Okay.

MR. BURNSIDE:  But we can do that.  We can try to talk to him and see.

THE COURT:  All right.  I mean, as far as the motorcycle is concerned, what he would be giving up if he agreed to this, or if I ordered it, is any interest he has in the motorcycle.  So if Larry Castle or the bank or someone else has an interest in it, that's not affected.  It's just

his interest in the motorcycle.  As far as the $300,000, I don't know how that was calculated.  So I'm just not sure about that.

MR. BURNSIDE:  I'm not sure how it was calculated either.

MR. RICHARDSON:  Under the Rico forfeiture, he is criminally responsible for all, jointly and severally responsible, for all proceeds from the Rico activity.

THE COURT:  Right.

MR. RICHARDSON:  What that is is described to the Grand Jury.  And, otherwise, it's basically you look at the cocaine, the drugs, the money laundering, the guns; that is the quite low, I think, estimate of the proceeds received by this conspiracy.  Just like in a drug --

THE COURT:  So you basically totaled it up for everybody and then said that they are jointly and severally responsible.

MR. RICHARDSON:  Correct, Your Honor.  For some individuals who had limited involvement, you recall what, for example Mr. -- well, I guess that's a -- how about Mr. Thrower, for example.  He had limited involvement, wasn't a leader, wasn't responsible for lots of other things.  We limited his to the activity that he personally was involved with.

With Mr. Bifield, we're not able to do that because he

literally was involved with everything, from our perspective. We certainly have the legal right to make Mr. Thrower jointly and severally liable for the whole $300,000. We chose out of our discretion not to do that.

THE COURT: Okay. All right. Well, I guess we'll have to delay that.

MR. RICHARDSON: Your Honor, I will point to paragraph 9 of the plea agreement where the defendant agrees to voluntarily surrender and not to contest the forfeiture by the United States of any and all assets and property owned or purchased by the defendant which are subject to forfeiture pursuant to any provision of law and are in the possession -- ya-da, ya-da, ya-da. That's paragraph 9 of the plea agreement.

THE COURT: Is his position different for the two different items, or is it the same?

MR. BURNSIDE: Well, he really doesn't own anything. So, I mean, I think his position would be different. Paragraph 9 would appear to encompass the motorcycle; whereas, I don't think that paragraph 9, the language there does not seem to cover the $300,000 judgment. I know that the defendants who went to trial, the jury did not forfeit the motorcycles. So I'm not sure how that plays into the Court's ruling on this.

THE COURT: It doesn't. I mean, he agreed. He

signed a plea agreement and agreed to forfeit it.  All right.
Well, I guess my thought is, I want to give Mr. Bifield a
chance to say anything he wants to say about this Harley
Davidson, but my thought is that I need to know whether he
opposes forfeiting any interest that he might have in that
motorcycle.

MR. BURNSIDE:  If I can have just a moment.

THE COURT:  Do you know the extent of the lien on
the motorcycle?  Does anyone know how much is owed versus --
in other words, how much equity there is versus how much loan
there is?

MR. RICHARDSON:  The answer is someone knows.

THE COURT:  But you don't.

MR. RICHARDSON:  I just don't want to say that.
Someone does know.  I have seen that information, but I can't
tell you if it's this motorcycle as compared to the other
ten.

THE COURT:  Well, if the lienholder has a large
lien, often the Government just turns the motorcycle back
over to the lienholder.  Rather than selling it, they just
give it to the lienholder.  If it's a low lien and there is a
lot of equity in it, then often the Government will auction
it and then pay off the lienholder.

MR. BURNSIDE:  From what Mr. Bifield tells me, he
believes that it was about $5,000 owed on it a year ago or

whenever he was arrested. I mean, I assume interest has continued to run on it. It was worth in excess of $20,000 at the time. But he believes that it's been left outside and may have deteriorated. I'm not sure whether the Government agrees with that or not. But he is -- and correct me if I'm wrong -- I think he's willing to not contest the forfeiture of the motorcycle.

THE COURT: All right. Is that correct, Mr. Bifield?

DEFENDANT: Yes, ma'am.

THE COURT: Okay. All right. Then what about the $300,000 judgment?

MR. BURNSIDE: Judge, Mr. Bifield is 61 years old right now. Looking at the time that he's looking at --

THE COURT: Right.

MR. BURNSIDE: -- $300,000, I mean, he just -- there's no way that's ever going to be paid.

THE COURT: I agree it's not collectible unless he's got some property hidden somewhere. But I need to know whether he opposes it or not.

MS. EVATT: Your Honor, is it your understanding that that would come out of his inmate wages in the BOP? Or is that something in the future, that if he ever had assets? I would hate for him to pay towards that for --

THE COURT: I have not seen them execute on

judgments that way.  They do take that money for restitution and for special assessments, but I have never seen them execute on a judgment, unless somebody, like if he inherited money and he put that into his inmate account, which would not be smart; in any event, if he did that and they found out about it, they might try to levy on it.  But I've not seen that happen.  I've only seen it with restitution.  But I can't say for sure what the BOP would do.

MR. BURNSIDE:  Judge, he's not going to oppose the Government's motion.

THE COURT:  Is that correct, Mr. Bifield?

DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  Then I'll enter this judgment and preliminary forfeiture as part of the sentence.  Okay.  Now we go to Ms. Evatt.

MS. EVATT:  Thank you, Your Honor.  The character witnesses will take you up on your offer to hear from them first, and I'll go last.  I would call Charles Nelson.

THE COURT:  Okay.  Mr. Nelson.

MR. BURNSIDE:  Tell Judge Currie your full name and then tell her what you think she needs to know about Mr. Bifield.

MR. NELSON:  Your Honor, my name is Charles Daniel Nelson, Jr.  I'm here today to give a character assessment or reference for Daniel Bifield.

THE COURT: All right.

MR. NELSON: I knew Mr. Bifield in 2010. We moved from New York to South Carolina in 1999. From 1999 until 2008, I was employed at the Department of Corrections and attained the rank of Lieutenant. I was subsequently attacked at the prison and stabbed several times and was put on disability. And I'm unable to work but I am able to function, so I was able to ride a motorcycle.

I went to a charity event that was sponsored by Mr. Bifield's club -- not his club, but the club he belongs to -- and met him, subsequently struck up a friendship. My wife is a registered nurse. And Lisa and Dan had us over to their house several times. I slept overnight one night there when they wouldn't let me ride home because I'd just been up too long.

Mr. Bifield is a very good and charismatic man. He settles many disputes between parties that would otherwise solve them in other fashions. And he personally looked at me one day and said, look, you've got to stop smoking. And that's why I don't smoke today.

We in all the time we were at their house never witnessed any kind of criminal activity. I fell away from the whole situation because we live in Clarendon County. It was just too far to ride after 2010. But in all the time that I was with Dan, and we rode together quite a lot, I just

never saw the things that I'm hearing here in the court today.

I did get a chance one time to go to this jewelry store. And this man that ran the jewelry store was trying to get anybody he could to sell him anything they could. But he was kind of a bad apple, and I said so to Dan at that time. I said, I don't think I want to go there any more. And he said, well, then you don't have to.

But at no time, Your Honor, did Mr. Bifield ever engage in any criminal activity that we were aware of and was always very kind and generous. So was Lisa, to both me and my wife. And we consider them to be some of the few friends that we've got in South Carolina, because we relocated and don't have any family or friends here.

So I just came today to lend some support and let you know that there is another side of the coin and that he's actually a very good man that deserves some credit for some of the good that he's done, especially here in South Carolina and to people like me who are from out of state. I think --

THE COURT: Which prison were you injured? Where were you working when you were stabbed?

MR. NELSON: Evans.

THE COURT: Evans?

MR. NELSON: I was a sergeant at the Waxsaw Unit, which is closed custody.

THE COURT:  That's Bennettsville?

MR. NELSON:  Yes, ma'am.  I have actually been to all 29 because I was part of the Rapid Response Team.  But be that as it may, at no time was I ever shown any deferential treatment because I was part of law enforcement.  I was treated as a friend and accepted by everybody, all of his club brothers.  And nobody ever, ever treated us in a derogatory manner, or my wife for that matter.

THE COURT:  Did you know that he had served 27 years in prison?

MR. NELSON:  He mentioned that.  Yeah.  He told me that during that time he had learned a lot and that he'd come out a much less violent man and a lot more mellowed out and that he was pretty much set on living a calm life.  And that's all I ever witnessed.  And like I said, Your Honor, I was there quite a bit.

THE COURT:  Right.

MR. NELSON:  So whatever evidence has been presented and whatever has really been discussed I haven't been here for, but I can tell you from my experience that he was a good man to us.  And I can personally think of nothing that I would have thought would have been out of line, would have gotten me in trouble when I was around him or the members of his club.

THE COURT:  Right.

MR. NELSON:  That's all I have.

THE COURT:  Well, thank you.  I'm sure he appreciates you coming up here.

MR. NELSON:  Thank you, Your Honor.

MS. EVATT:  The next person I would call is David Gregory Thompson.

THE COURT:  Good afternoon.

MR. THOMPSON:  Good afternoon, Your Honor.  My name is David Gregory Thompson.  A little bit about myself.  I served 20 years in the U.S. Army, retired military vet.  I met Dan back in 2008.  So I've known him since then.  It was at a music venue that some motorcyclists were doing down at Shucker's in Sumter.

And I knew a little bit about his background when I first met him.  And the day I met him, he never, you know, portrayed that kind of background that's out there about him.

I read a story one time on the Internet.  It was in a newspaper that they had put on there.  And they were discussing about the overcrowding of prisons up in Connecticut.  And I think the story came out in around 1981.  But it was about this young man that was being held there in a local prison.  And they were talking about how they were mixed in with some violent criminals.

And the story goes, is the young man got approached to get a shakedown by some people, and they said out of nowhere

there was this rather large built man that came out and he was known to be a Hell's Angel, and the people walked away and left the guy alone.

But it's things like that that he does for people. You know, I've witnessed numerous benefits that we've been to where he's been and helped with the benefit. Not just show up, but he's out there working it out there.

He put on a vest one day over at The Dog House out there directing traffic. And the local police was right there on the next corner. And he goes over there and talks to them, you know. And they're making sure everybody is safe pulling in off the busy highway and everything.

He's always looking out for the people, his friends. And I just -- I know in my heart that if I ever needed anything that he could help with, he would do it. And just like Chip said, the five years that I was around him, I never was approached, never was asked about any kind of illegal activity. Do you want to buy this? Would you like to try to sell this or anything? Never witnessed anything like that whatsoever.

And he's a true, true friend that I really believe in my heart that I just -- the cards that he got dealt was just a bad deal. And I just hope that you see in your heart that you can do what you can to help him out.

THE COURT: Thank you.

MR. THOMPSON:  Thank you.

MS. EVATT:  Your Honor, the next two I'm going to call up together.  It's a grandmother and granddaughter, Dotty Madden who is Lisa Bifield's mother, and Brittany Burns who is Lisa Bifield's daughter.

THE COURT:  Okay.  Yes, ma'am.  Tell us your name again.

MS. MADDEN:  Dorothy Madden.

THE COURT:  Thank you.

MS. MADDEN:  I knew Dan -- well, I really didn't know Dan until after he married my daughter.  But Dan had a hard life.  His father died when he was a young teenager and then his mother abandoned him and left him to fend for himself.  After he married my daughter, I got to know Dan.

He's a good man.  He's an honest man, very respectful.  And we took him in as a family.  And to this day he tells me that I've been more of a mom to him than his real mom has.  And he thanks me for that and said he's found a lot of happiness with our family.  And I just hope you will consider that, because he has been very helpful to us.

And it's hard to believe all these things they're saying about him, because he didn't -- that -- he didn't portray that side that they're accusing him of.  But we love him.  We welcomed him in the family.  He has a family that loves him.  He has a family that will support him now, because when he

was young he didn't have that.  He just had to fend for himself.

And so we really hope you will consider, you know, not sentencing him as long as you think he needs to be there.  But he has a family when he does get out that we will welcome him there and guide him in the right direction because we love him.

THE COURT:  Thank you.

MS. MADDEN:  Thank you, Your Honor.

THE COURT:  Okay.  If you feel like you can speak, start with your name.

MS. BURNS:  Brittany Burns.

THE COURT:  Okay.

MS. BURNS:  We love Dan very much.  He has been nothing but honest and respectful to our family.  He has tried to even make my mom and I have amends because we didn't have a close relationship.  He's just always been there.  And since this happened in June of last year, our whole family has been shattered.  Our family has fallen apart.

And, I mean, I know he has to pay for some of the stuff that he's done, but I just ask that you not sentence him to 20 years.  I have called off my wedding for all of this.  We were supposed to get married last year and mom and Dan were going to be in it.  I had to call off our wedding.

THE COURT:  Thank you for coming.

MS. BURNS:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. EVATT:  Your Honor, that would be all the character witnesses for Mr. Bifield.

THE COURT:  All right.

MS. EVATT:  He would like to speak.  I'll let him speak last.

THE COURT:  Okay.

MS. EVATT:  Your Honor, Mr. Burnside and I did file a sentencing memorandum in this case asking Your Honor to consider a variance for a number of reasons and asking Your Honor to sentence Mr. Bifield to below 20 years that is his current guideline range.

Your Honor is well aware of the factors in 3553(a), but I will briefly address the ones that pertain to Mr. Bifield and the reason that we're making this request.

The first one is the nature and circumstances of the offense and the history and characteristics of the defendant. Well, you've heard a lot about the offense during the six-week trial but probably very little about Mr. Bifield, at least very little good things.

As Lisa's mother just said, he did have a rough childhood.  He's been on his own since he was a teenager.  He was very little when his parents divorced and he was raised by a mother and stepfather.  He dropped out of school at an

early age and was basically living in the streets.

He tried to join the military.  He desperately wanted to be a Marine.  And he went to the recruitment office up in New York where he was from and enlisted in the Marines.  Unfortunately, he was 17 years old at that time and his mother wouldn't sign parental consent.

So he continued living on the streets until he met some young men and older men that were in a motorcycle club who took Dan in as a 17-year-old and basically finished raising him.  And he had a family for the first time in his life.  And he quickly excelled and became a Hell's Angel.  He's been a Hell's Angel for 38 years, finally found the structure and the family that he was looking for his whole life in the Hell's Angels.

He currently is a Hell's Angel and as Mr. Burnside said hopes to die a Hell's Angel.  But that's not his whole life now.  When he was 59 years old he met and married Lisa Bifield and finally had another type of family who are seated back here.  He finally had a mother, a father, stepdaughters, step-grandchildren, step -- well, sisters-in-law who embraced him and loved him like their own, and he finally had a family.

I would say that the family sitting back there is equally as important as the Hell's Angels to him.  And he probably never thought that was possible.  He loves this

family desperately and loves Lisa Bifield.

As you can notice from his pre-sentence report, he has a lengthy record. Most of it was in his youth when he was a little bit wilder. You'll also notice that in the majority of his prior record he went to trial. He was a fighter. He fought every trial, every charge. And that's the way we prepared this case, too. We thought 100 percent sure that he would go to trial with his brothers.

And only in December, late in December, a couple of days after Christmas, when his wife was offered a chance at five years did he do an about-face and basically signed this plea agreement to a cap of 20 years to save Lisa.

At that time we didn't know that Lisa might not have needed saving because she had already been cooperating. And once he found out that, it didn't change his opinion. You know, he still wanted the plea to go forward. He still wanted to save his wife. And if he had to get 20 years and the chance that she would get five, despite her prior cooperation without him knowing about it, he instantly forgave her and wanted to continue to save her.

Judge, the other factor, the seriousness of the offense; as stated in the sentencing memorandum, Mr. Burnside and I believe that this offense has been overstated, and we believe that the unique convergence of circumstances have arisen in this case to warrant a variance on the grounds of sentencing

manipulation and/or imperfect entrapment or sentencing entrapment. And we urge Your Honor to follow the lead of the First, Eighth, Ninth, and Eleventh Circuits who have adopted this at sentencing and sentence below the advisory guidelines.

While entrapment may not have been a defense to Mr. Bifield at trial based on his prior record and predisposition, sentencing entrapment is applicable in this case. Because what Mr. Bifield pled guilty to was the bath salts and the money laundering, is what he admitted to at the plea. That's what he wanted to do in this case. He didn't come up with the robbery, the fictional robbery in New York of the five pounds of methamphetamine.

And all of Mr. Burnside's arguments regarding our objections to using that guideline range, leader, organizer, the amounts I would like to incorporate into the variance argument; and specifically that Mr. Bifield never agreed to this robbery.

Mr. Burnside and I listened to hundreds of hours of tapes. And one that sticks out in my mind was when Joe the Jeweler kept saying what was going to happen with these guns. You know, Mr. Bifield got frustrated and said, I don't want to know. Just don't tell me. Don't keep repeating the story, Joe. I don't care what happens with these guns. I don't want to talk about it. Clearly he didn't participate

in that.

Mr. Bifield has stated I believe in some of the things that we filed with the court recently that he never believed that Joe the Jeweler was in the Mafia or could arrange a robbery or sell meth in Canada and he was just taking him for a ride. I believe the evidence does show that he did keep the $15,000 once he figured out that Joe was not capable of performing these robberies or this money laundering, that he was trying to use him and get as much money as possible.

As Your Honor and Mr. Burnside discussed, this makes a big difference in his guidelines. He's a level 34 now. If you don't use the fictional meth and the robbery, he would be a base offense level of 28 with a guideline range, best case scenario, of 188 to 235. But --

THE COURT: Now, that's without the bath salts and the meth.

MS. EVATT: Right.

THE COURT: Right.

MS. EVATT: Your Honor, we feel like this offense and what he pled to has been overstated. It was not his idea. It was the FBI agent's and Joe the Jeweler who directed the fictional robbery. All of that has been gone over.

The other factors, Your Honor, is deterrence. You know, he's 61 years old. If Your Honor sentenced him to ten years

or fifteen years, that would be a big deterrent to others who were thinking about getting involved in these type of offenses.

Also in the motion is his age. We cited he'll be 62 years old this year. And we cited studies about recidivism and the likelihood of older defendants committing other crimes. Best case scenario, he'll be out in his seventies. Whether Your Honor sentences him to ten, fifteen or twenty years, he will be in his seventies. It's not likely that he would re-offend.

And then the last thing that 3553(a) directs courts to look at is the needed educational or vocational training, and including medical care. Obviously it would be very expensive to house geriatric defendants in their seventies.

And, Your Honor, what has come through with these character witnesses is that he will have a place to go when he finishes. He does not have a family. You noticed that not one blood relative came today and nor did they come to the trial or to his plea. But these friends, these Hell's Angels, these other motorcycle riders did come to a lot of the trial and supported Dan and his other brothers and the family. Lisa's family has been here for him.

He would ask me to ask Your Honor to consider designating him to a South Carolina facility. I don't know if he will qualify for a medium or he will be designated to a

USP.  He's done time in both.  Because of his age and the fact that a lot of these convictions are old, he might have a chance at a medium.  But he would ask Your Honor for a recommendation to a South Carolina facility so that Lisa and Lisa's family could visit him when she's released and while they are serving time.  And, Your Honor, Dan would also like to briefly address you.

THE COURT:  All right.  Yes, sir.  Mr. Bifield, you are not required to speak but you're certainly welcome to do so.

DEFENDANT:  All right.  I'd like to say I'm very sorry for all the pain and suffering I've caused everybody, especially my wife, my club, and my family.  I never meant to hurt anybody by my actions.  I hope that everybody can forgive me.

I wish I never met Joe Dillulio or that I ever introduced him to my wife or my friends.  I am very disappointed in myself for allowing somebody like Joe to talk and trick me into doing something wrong, and I have learned a very valuable lesson because of it, and I've lost everything I love and I had.

I wanted the Court to show mercy to my wife, Lisa, and to my Hell's Angels brothers when they got sentenced.  And I ask no mercy for myself.  I am a proud member of the Hell's Angels Motorcycle Club.  And if I am to be punished for it,

to die in prison, then let it be; I'll accept that.  And I know in my heart that God knows He'll show me justice and He knows the truth.  And I'm very sorry for everything, ma'am.  Thank you.

THE COURT:  All right.  Thank you.  All right, Mr. Richardson, your response to the request for a variance.

MR. RICHARDSON:  Your Honor, we do oppose it, Your Honor.  And I'll try to be brief, unless Your Honor has specific questions about it.  As Your Honor is well aware, the plea in this case, which was the plea offered to the other three main members of this case, this case began with four main defendants.  That's Bifield, Baker, Oiler, and Long.  Those are the four lead defendants.  They were all offered the same plea, and that was a 20-year cap.

As discussed with the lawyers, for each of them, everyone estimated their guidelines would be well in excess of that 20-year cap, and the 20-year cap was offered as a way of limiting their exposure.  For Mr. Bifield's case, as I think it would have been for the other cases, it's a substantial cut.  And Mr. Bifield's agreement to plead provided the prosecution a substantial benefit in doing so.

The amount of time that we had to prepare for trial and the volume of evidence that was there was substantially helped by his decision to plead.  And that's why the Government offered him a substantial reduction, but that is

already taken into account in the 20-year sentence that he faces.

His decision to plead benefited the Court as well. It would have been a much longer trial. And while I know the Court would have enjoyed that, it was probably long enough as it was; similarly, with the U.S. Marshals and the security that was, you know, given. But that is the benefit that's been provided to him with a 20-year sentence instead of the 360 to life sentence that he faced otherwise.

Just briefly with respect to the sentencing manipulation theory, as Your Honor instructed the jury, and there's extensive case law, the concepts of stings are a necessary and critical part of law enforcement. They are used and well accepted. And here it was done appropriately.

As the court, the Fourth Circuit, which has not taken the approach that the defense is asking in the Jones case, I believe it was a '94 case; but in Jones the Court said that, you know, it's never been supported or adopted or used by the Fourth Circuit. In that case it sort of went on to say, well, even if it was, it would require the type of outrageous government misconduct that is not present in this case.

And I think the Jones case is sort of an easy example similar to this case. We don't think it ought to ever apply. We don't think it's an appropriate theory. But, regardless, in this particular case, given Mr. Bifield's action, it's not

appropriate.

In the Lewis case, for example, from the Fourth Circuit, it was rejected; the same sort of grounds, never been applied. But even so, in a six-kilo sting, it was not applied. It was a six-kilogram cocaine sting in the Lewis decision.

This sort of comes back -- and I'm not going to rehash the first argument we had -- where I did get a little bit into the variance issues about the nature of this punishing a conspiracy as well as Mr. Bifield's other criminal activity that pre-dated the informant's involvement as well as how the guidelines as they're calculated in a number of ways understate his criminal culpability relative to the 360 to life guideline range that he began with that was reduced by the 20-year cap.

The final thing that I'll just touch on, Your Honor, is Mr. Bifield's extensive record. I don't need to belabor that. Your Honor has seen it. He's the poster child for a recidivist. He spent 27 years or more in federal prison as a result of crimes he's committed as a Hell's Angel. And he is actually the exact opposite example from the studies that Ms. Evatt cites about recidivists as people get somewhat longer in the tooth.

Mr. Bifield gets out when he's 60 and while he's still on supervised release goes right back to his criminal ways.

While he was in the BOP, he engaged in a money laundering conspiracy. He was convicted of being in possession of heroin while in the BOP. I mean, he is the poster child for someone who, despite his age, is going to go right back to the criminal conduct, and we think a 20-year sentence for him is appropriate.

THE COURT: Have you been in touch with the solicitor in Lexington concerning the criminal domestic violence charge that's pending against him? Do you know whether they plan to dismiss that?

MR. RICHARDSON: I think it's highly likely, because my understanding is that Ms. Bifield refuses to cooperate with respect to that. The witnesses -- we do have some recordings about it. We've not policed any of those recordings. Based on Your Honor's orders and the resolution of this case, there are some recordings that discuss it that we will talk to them about. But I think -- given the sentence he's going to get, I think it's unlikely.

The only witnesses to the domestic violence was in a bar one night, were primarily members of Hell's Angels who won't talk to law enforcement. So I think it is a very difficult, if not impossible, prosecution in light of Ms. Bifield's refusal to cooperate and the witnesses who were there who claim to have seen nothing, that that could ever be or ever would be prosecuted. I have not had specific discussions

with them about it, but I strongly suspect that that would be the case.

THE COURT:  What about, since he was on supervised release at the time this offense was committed, are you aware of whether or not there is any -- is there any chance of a revocation from I guess Pennsylvania or Connecticut, wherever he was --

MR. RICHARDSON:  I don't believe so, because his conviction didn't occur while -- his supervised release has been terminated.  It was terminated I believe on December the 2nd of 2011.

THE COURT:  And they didn't file anything before that?

MR. RICHARDSON:  Well, yeah.  They didn't know about anything it.  So they didn't file anything.  It was before.  It was before the case was taken down.  So he's committing these actions while on supervised release.  But they have a party on December the 2nd of -- I think it's the 2nd; I may be off by a day or two -- where he gets off papers, as he describes it.  He gets off supervised release.  So I don't think there's any way on the back end that Pennsylvania can come back now since he's been let off.  But Mr. Dean stands up, which is generally a sign he's going to tell me I'm wrong.

THE COURT:  Okay.

PROBATION OFFICER: No. No. You're correct. And, Your Honor, we were supervising his case from Pennsylvania and I believe also Connecticut in our office here in Columbia. And his case did expire in December of 2011 successfully. And nowhere -- there is no outstanding petitions or warrants to revoke his supervised release.

THE COURT: Okay. All right. Anything else?

MR. RICHARDSON: Nothing, Your Honor.

THE COURT: Anything else from the defense?

MS. EVATT: Your Honor, just briefly. The Jones case from the Fourth Circuit was the only one that I could find, too, that addressed sentencing manipulation. And they simply didn't apply it to the facts of this case. In Jones, what the police did was just kept making undercover drug buys until they reached a threshold quantity. These were actual crimes. Our case is distinct because there was not an actual crime.

THE COURT: Okay.

MR. BURNSIDE: Judge, could I say one more thing? All the cases, the Fourth Circuit cases, do not -- they're all pre-Booker cases, I mean. And they were often trying to use sentencing entrapment as a defense to the charge, or at least to the greater drug amount charges. So this is not -- I mean, I don't know that any of that case law is controlling since the Booker decision. The courts have much more

discretion than they had then.

And if I could respond to a couple of remarks by Mr. Richardson. I don't think it's a fair statement that all of the lawyers agreed that the guidelines were going to be well in excess of 20 years. You know, the meth, I knew he was going to argue for the meth amounts, but I did not take that as a given that those drug weights were going to be included against Mr. Bifield.

So I don't think it's fair to say that it was assumed that his guidelines were going to be way over 20 and therefore he's already gotten some reward for his guilty plea. The fact is his guideline is 20 years. He has pled guilty. He's saved this Court, saved the Government a great deal of time and money in prosecuting him. And I have spoken to other lawyers whose clients pled guilty also who signed plea agreements after Mr. Bifield. So I don't think it's just him and Ms. Bifield's plea that we're talking about here. I think there has been substantial savings to the entire system based on his decision.

I also think that the Court should take into consideration Mr. Bifield's behavior. I mean, in court, you know, he's been a perfect gentleman at all of his court appearances. He has had perfect decorum. And I think following his lead, the other defendants have, too. He has been -- he could not have been a better man to get to know as

his lawyer.  He just has a great deal of charisma.

I mean, I do think that his story and the story you've heard here is a great American tragedy.  The fact that he's facing 20 years at this stage in his life, I feel it's too much time.  I think he can be adequately punished by substantially less than 20 years.  It's expensive to lock up inmates in general.  To lock up inmates in their seventies is hugely expensive, the medical costs and everything else associated with it.

The FBI, they launched this investigation.  And I know they made that decision.  They made their case stand up.  But I hope someone higher up the chain of command of the FBI is looking at the value of it, the worth of it, whether they really -- I mean, they have spent millions of dollars.  Has it been worth it?  And I don't know that that question has been asked or answered.

Your Honor, I just think that the guidelines are too high here in view of all the facts and would ask you to temper your justice with mercy here.

THE COURT:  All right.  The Court is going to grant in part and deny in part the defendant's motion for a variance, is going to vary to 210 months.  I'll give you the reasons in detail in just a moment.

I have looked at the sentencing factors and the 3553(a) requirements and have considered, and most significantly in

determining the variance, the nature and circumstances of the offense. I agree that I don't find that there was sentencing manipulation, but I do find that the guideline here does overstate to some degree the seriousness of the offense, particularly as to the drug portion of the case in dealing with the meth.

So I looked at what the guideline range would be without the meth, and that guideline range is 210 to 240 months. And that was one factor that I considered, so that he would not be unduly punished by the addition of the five pounds of meth, which technically and legally is allowed and under Fourth Circuit law is appropriate, but under the circumstances of this particular case is a factor that I have considered.

Also when I was looking at the nature and circumstances of the offense though, I look at the fact that after serving 27 years and coming out of prison and meeting the love of his life, he then does this. And he doesn't just do it one time. He does it over and over and over again.

And you are really a lucky man, Mr. Bifield, to have these people still love you, because I have to say that I have to agree that I don't think Lisa Bifield would have done all these things had she not been married to you and with you. Luckily, she is not paying an extra price, because she got a better deal as a result of your actions. And so you've

ameliorated that pain to her and her family to some degree by your actions.

But to come out of prison and then, stupidly or not, whether it's stupidly or whether or not it's from being mean or tough or whatever, greedy, I don't know; but it just makes no sense.

When I look at your history and characteristics, I see that, you know, despite serving 27 years in prison, you have a lot of people that love you and a lot of people that care for you, so that there's some good qualities.

You have what I would call a serious criminal history. And I agree with Mr. Richardson that there are offenses that occur while you're incarcerated. So it's not like everything became rosy and fine once you served that long sentence. You were still offending while you were in prison. You were still offending when you got out of prison.

And a lot of that could be attributed to your background. But, you know, it's a tough life when you end up meeting your father in the penitentiary. So things don't get much worse than that. And, I mean, you're both inmates.

So I have also considered your age. And I have determined that there is some ameliorating factor there in the fact that you are already 61 years old. And so a slightly shorter sentence than the maximum is appropriate.

I have considered the fact that people are looking at

this case, other people who might consider offending, and that there needs to be a significant sentence to show that people cannot continue to do this and get released and get back into the criminal world.

One of the things that I looked at that I could sort of set aside all of the bad things that you folks say about Joe Dillulio and just look at you is the arson. It's pure. There is no Joe in the arson. There's you and Lisa and some other guys I guess. And that is a really serious crime. And it's done based on greed and you got paid for it. And nobody made you do that. Nobody enticed you to do that. Nobody entrapped you to do that. You did that. And you involved your wife. So obviously a significant sentence is needed to address that type of conduct.

As far as medical care, you know, my impression of you, Mr. Bifield, is that you'll be one of the strongest older inmates out there, that you've served enough time, that prison, you're pretty aware of where you're going and what's going to happen there, and you'll be in control of that. And I wouldn't be surprised to see you released and still capable of coming back and committing crimes. And I'm hoping you will not do that. I hope that this family that you have now will make you change so that when you come out the next time you'll have them to go to and you'll change your ways.

So I have considered all of those things. I know that

your lawyers have asked me for a much greater variance. They would like a much larger variance. The Government doesn't like any variance at all in your favor. But after balancing all of those things, I have come to the conclusion that 210 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

And so, having done all of that, it's the judgment of the Court that you, Daniel Eugene Bifield, also known as Diamond Dan -- I saw that you signed your statement as Diamond Dan -- are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 210 months.

One of the other things that I have considered as well is sentencing disparity. And I've sentenced a number of people. I've still got others to sentence. And so I factor that in as well so that there's not an unwarranted sentencing disparity based on what people did and their roles in this conspiracy.

So it appears that you do not have the ability to pay a fine. That is waived. But you must pay the mandatory $100 special assessment fee which is due immediately. When you are released you'll be placed on supervised release for three years. Within 72 hours of being released you must report in person to your probation office in your District, and you must comply with the mandatory and standard conditions of supervision; this time for real.

And you must satisfactorily participate in a substance abuse treatment program if ordered by probation, including drug testing, and satisfactorily participate in a mental health treatment program as approved by probation.

I also am going to enter the preliminary order of forfeiture that we discussed earlier, and that will be part of your sentence.

Are there any objections to the form of the sentence, Mr. Burnside?

MR. BURNSIDE:  No, Your Honor.  Thank you.

THE COURT:  From the Government?

MR. RICHARDSON:  No, Your Honor.

THE COURT:  All right.  Now, you entered also a plea agreement that has an appeal waiver.  Only in unusual circumstances may someone who has given up their right to appeal pursue one.  But you should discuss that with Ms. Evatt and Mr. Burnside.  And if you decide to try to seek an appeal, it must be done by filing a written notice of appeal with this court within 14 days of the entry of your judgment order.  They will advise you of that deadline.

If you and your lawyers disagree about whether an appeal should be filed, you may file your own appeal, but it must be submitted to this court, not the Court of Appeals, to the District Court, within that same 14-day period.  And if you're unable to afford the services of an attorney to handle

the appeal, you may apply for court-appointed counsel from the Court of Appeals.  Do you understand those rights?

DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  I'm going to recommend that you be incarcerated at an institution in South Carolina for which you qualify.  I can't tell you whether that will happen or not, because we don't have a penitentiary in South Carolina, and you may be required to go to one.  There is one in Atlanta.  So if you require a penitentiary, do you want me to recommend -- if a penitentiary is required, do you want me to recommend Atlanta?  It's the closest one that I know.

PROBATION OFFICER:  Your Honor, Atlanta is no longer a penitentiary.

THE COURT:  Oh, really?

PROBATION OFFICER:  It's still called USP Atlanta.

THE COURT:  Oh.

PROBATION OFFICER:  But it's actually a medium security place.

THE COURT:  Okay.

PROBATION OFFICER:  I think the closest penitentiary to here would be Coleman, Florida; USP Lee in Virginia; Big Sandy, Kentucky; or Hazelton, West Virginia.

THE COURT:  You want me to recommend USP Coleman?

DEFENDANT:  (Nods head affirmatively).

THE COURT:  Okay.  I'll do that.

DEFENDANT:  Thank you, ma'am.

THE COURT:  Okay.  Counts and indictments to be dismissed?

MR. RICHARDSON:  Yes, Your Honor.  We'd move to dismiss the remaining Counts and any remaining forfeiture allegations.

THE COURT:  Okay.  All right.  Anything further from either side?

MR. BURNSIDE:  Nothing, Your Honor.

MR. RICHARDSON:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  We're adjourned.  Good luck to you, Mr. Bifield.

(WHEREUPON, the proceedings are concluded.)

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


s/Jennifer H. Williams

_____              June 11, 2013

Jennifer H. Williams, RPR